NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11901


KAMEE VERDRAGER  vs.  MINTZ, LEVIN, COHN, FERRIS, GLOVSKY &
POPEO, P.C., & others.[1]



Suffolk.     November 5, 2015. - May 31, 2016.

Present:  Botsford, Duffly, Lenk, & Hines, JJ.


Anti-Discrimination Law, Employment, Sex, Termination of
    employment.  Employment, Discrimination, Sexual harassment,
    Demotion, Retaliation, Termination.  Unlawful Interference.
    Practice, Civil, Summary judgment, Discovery.



      Civil action commenced in the Superior Court Department on
November 3, 2009.

      The case was heard by Peter M. Lauriat, J., on motions for
summary judgment.

      The Supreme Judicial Court granted an application for
direct appellate review.


      Kamee Verdrager, pro se.
      Joan A. Lukey (Justin J. Wolosz with her) for the
defendants.
      Ellen J. Messing, for Massachusetts Employment Lawyers
Association, amicus curiae, submitted a brief.
      Ben Robbins & Martin J. Newhouse, for New England Legal
Foundation & another, amici curiae, submitted a brief.

_____

      [1] Robert Gault, David Barmak, Bret Cohen, R. Robert Popeo,
and Donald Schroeder.

LENK, J. General Laws c. 151B, § 4, prohibits employers from discriminating against employees on the basis of gender. It also prohibits them from retaliating against employees for engaging in "protected activity," i.e., activity undertaken "to protest or oppose statutorily prohibited discrimination" (citation omitted). See Thirkield v. Neary & Hunter OB/GYN, LLC, 76 F. Supp. 3d 339, 350 (D. Mass. 2015) (interpreting G. L. c. 151B). Here, we are asked to determine whether summary judgment should have entered for the employer on an employee's claims for gender discrimination and retaliation. In addressing the retaliation claim, we confront the novel question whether it is "protected activity" for an employee to search for, copy, and share with the employee's attorney confidential documents that the employee is authorized to access in the course of employment and that may help prove a discrimination claim.

The plaintiff is an attorney who worked for a Boston law firm, defendant Mintz, Levin, Ferris, Cohn, Glovsky and Popeo, P.C. (firm). During the course of her employment with that firm, from June, 2004, to November, 2008, she complained to her superiors and, ultimately, to the Massachusetts Commission Against Discrimination (MCAD), that she was being subjected to discriminatory treatment on the basis of her gender -- treatment that, she believed, led to her demotion in February, 2007. In

the wake of this demotion, and on the advice of her attorney, the plaintiff searched the firm's document management system for items that might prove her assertions of discrimination. In November, 2008, after these searches were made known to the firm's chairman, the plaintiff's employment was terminated "for cause."

In November, 2009, the plaintiff filed the present action in the Superior Court, which, as amended, named as defendants the firm, certain firm "members"[2] with whom she worked, and the firm's chairman, R. Robert Popeo. The complaint alleged that both the plaintiff's demotion and her termination were the result of discrimination on the basis of gender, and that both also constituted retaliation for her having opposed such discrimination. The complaint specified five counts pursuant to G. L. c. 151B, § 4: gender discrimination (against all defendants except Bret Cohen); pregnancy discrimination[3] (against the firm); aiding and abetting discrimination (against all except the firm and Cohen); failure to investigate and remedy discrimination (against the firm); and retaliation (against all

---

[2] "Members" are the equivalent of "partners" at other law firms.

[3] Pregnancy discrimination is a form of gender discrimination. See Massachusetts Elec. Co. v. Massachusetts Comm'n Against Discrimination, 375 Mass. 160, 167 (1978) ("any classification which relies on pregnancy as the determinative criterion is a distinction based on sex").

except Cohen). A sixth count, tortious interference with contractual relations, was filed only against Cohen, who was not named in any of the other counts. The defendants then counterclaimed on various grounds.[4] Following cross motions for summary judgment, only three of the defendants' counterclaims survived,[5] and all of the plaintiff's claims were dismissed. The plaintiff appealed from the dismissal of her claims,[6] and we allowed her petition for direct appellate review.

We conclude, first, that the plaintiff has presented evidence from which a reasonable jury could infer that both her demotion and her termination were the result of unlawful discrimination, as well as evidence allowing an inference that both were the result of retaliation.[7] Therefore, summary

---

[4] The counterclaims alleged breach of fiduciary duty, conversion, fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of two Federal computer fraud statutes (18 U.S.C. §§ 2701, 2707, and 18 U.S.C. § 1030A). There was also a claim for replevin of the documents taken by the plaintiff.

[5] The surviving claims were breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing. The motion judge also granted the defendants' motion to enter separate and final judgment on all the counts as to which summary judgment had entered.

[6] The defendants did not cross-appeal from the dismissal of their claims. Neither the dismissed counterclaims nor the surviving ones are before us.

[7] As discussed in note 23, infra, the other claims -- for pregnancy discrimination, aiding and abetting, and failure to

judgment for the defendants on those counts was inappropriate. Second, we hold that an employee's accessing, copying, and forwarding of documents may, in certain limited circumstances, constitute "protected activity," but only where her actions are reasonable in the totality of the circumstances.[8]  Finally, we conclude that judgment was entered properly on the claim against Cohen for tortious interference with contractual relations.

1.  Background.  We summarize the facts, which are generally undisputed, "drawing inferences in favor of the plaintiff where they may reasonably be drawn from the facts." Young v. Boston Univ., 64 Mass. App. Ct. 586, 587 (2005), cert. denied, 549 U.S. 832 (2006).  To the extent that facts are disputed, we resolve them in favor of the plaintiff.  See Miller v. Cotter, 448 Mass. 671, 676 (2007).  We reserve certain details for later discussion.

After graduating from law school in 1999, the plaintiff practiced employment and labor law in New York.  In June, 2004, she began work as a fifth-year associate at the firm's Boston office, in its employment, labor, and benefits (ELB) section.

Throughout the course of the plaintiff's employment, the firm had in place an "Electronic Information System [EIS]

---

investigate and remedy -- are supported by the same evidence that supports the discrimination claims.

[8] Because it is unnecessary for our decision, however, we do not apply this rule to the plaintiff's actions in this case.

Acceptable Use Policy" (EIS policy). On June 16, 2004, the plaintiff signed a copy of that policy and agreed to be governed by its provisions. The plaintiff was trained in the use of Desksite, a document management system used by the firm, at the beginning of her employment. She was told that she "was supposed to save almost all documents which she authored to the public section of DeskSite" and "was expected to search the system regularly in connection with her work." Any documents in the "public" section of that system "were available to everyone in the firm who could access DeskSite." Such documents could be accessed directly or could be found through a general word search of the system's contents. Users also could choose, however, to save documents in a "private" section of the system, accessible only to themselves or to individuals that they specified. The EIS policy provided that the "EIS should be used, with limited exceptions, only for job-related communications. Although personal use is permitted, employees should do so with the full understanding that <u>nothing</u> is <u>private</u>" (emphasis in original). Associates frequently used Desksite for personal or nonbusiness reasons, including to check the time records of other associates to see "who was getting the most work."

The firm also had in place a confidentiality policy, which stated that "[a]ll documents, correspondence, forms and other

work product created or produced by the firm in connection with the delivery of legal services to the firm's clients are the sole property of [the firm] and its clients.  Such material should not be removed from the office or used for any reason other than for or in connection with the delivery of services on behalf of the firm."

Shortly after joining the firm, in late June and early July, 2004, the plaintiff was assigned to work with Cohen, a member in the ELB section, to draft a brief on behalf of one of the firm's clients.  In an electronic mail message dated July 19, 2004, Cohen stated that the client "has really liked our pleadings to date.  Let's keep up the good work!"  Another firm member, who also worked on the brief, later wrote in an evaluation that the plaintiff

> "not only has a sound command of legal principles but she appears to have great intuition and reaction to legal issues that will make her an excellent advisor to clients and an attorney who has much to contribute to strategic issues in matters.  On numerous matters in [this] case she has dropped by my office to discuss an issue and her intuitive response to the issue has been on point and well-considered . . . . I have not witnessed [her] interaction with clients, but I do know that she has had extensive contact with opposing counsel and the client in [this] matter.  My impression is that [the client] has appreciated [the plaintiff's] counsel and that [she] is well-respected and had 'run with the ball' in connection with opposing counsel in the matter . . . . I would certainly like to work with her again on any matters that involve ELB litigation[.]"

The plaintiff maintains that, while Cohen and the plaintiff were working on this brief, he made a number of inappropriate, sexually-charged comments to her.[9]  At some point in July, 2004, the plaintiff complained of these incidents to the firm's human resources office.  In mid-August, 2004, the plaintiff spoke with, among others, the firm's managing director, Peter Biagetti, and with the attorney managing the ELB section, defendant Robert Gault, about the incidents.  Gault and Biagetti met with Cohen in August, 2004, to discuss the plaintiff's assertions.  Gault and Biagetti concluded that her complaints were "management style complaints" rather than "complaints related to gender differences," and decided to hire an executive coach to work with Cohen.  At some point during that summer, firm chairman Popeo was informed of the plaintiff's complaints.  Popeo spoke with Biagetti and was told that Biagetti had looked into the complaints and had found no evidence of gender-based discrimination.[10]

---

[9] In particular, the plaintiff states that Cohen spoke to her about "having a 7-year itch [and] wanting to cheat on his wife."  He also called the plaintiff on the telephone to tell her "in a very provocative tone" that "I was dreaming about you last night."  Cohen denies having made such comments.

[10] Throughout the course of the plaintiff's employment, various meetings were held to discuss both the plaintiff's claims of discrimination and, more generally, the issue of gender discrimination at the firm.  The meetings involved, at different points and among others, Gault, the ELB section manager; Barmak, who would replace Gault as section manager;

In October, 2004, after a client complained to Cohen about the plaintiff's performance, Cohen asked the client to submit the complaint in writing, which Cohen then forwarded to Gault, the ELB section manager, and Starr, the director of human resources.[11]

Also in October, 2004, various individuals, both members and associates, told the plaintiff that Cohen was making negative remarks about her.  In evaluating the plaintiff's performance in the fall of 2004, Cohen rated it as "usually below expectations."  He wrote that the plaintiff

> "needs a great deal of help on her writing.  She is smart and seems to have a great deal of institutional knowledge but, at least when I dealt with her, was unable to translate her knowledge into a cohesive thought. . . . Orally, I find that she does not speak with confidence. For example, she says 'um' a lot."

The concerns regarding the plaintiff's writing were echoed in the comments of her other evaluators.  Defendant Donald Schroeder, then a senior associate in the ELB section, who would later be promoted to membership, rated the plaintiff's performance as "always meets expectations."  In his written

---

firm chairman Popeo; Schroeder, a member of the ELB section; Rosemary Allen, a member who oversaw personnel matters; and Wendy Starr, director of human resources.

[11] Cohen stated in his deposition that he had never previously solicited a written complaint against an associate and that he did so here "because in my entire time being a partner at any law firm . . . I had never once had a client say, I don't want to work with this attorney.  She was rude, and it upset either me or somebody else."

comments, however, he added that the plaintiff "needs to develop her analytical writing skills and organize her thoughts more clearly on paper." Gault rated her work as "usually meets expectations" and noted that "I do not have much exposure" to her work but "I've seen a few things [in her writing] that suggest a need for more attention to detail."

In January, 2005, Cohen increased the scope of a research project he had assigned to the plaintiff. This project did not count toward her quota of hours billable to clients. Based on conversations she had at the time with her colleagues, the plaintiff maintains that the scope of the nonbillable work assigned to her was greater than that assigned by Cohen to other associates, a point that Cohen disputes.

On February 2, 2005, the United States Court of Appeals for the Fourth Circuit upheld a jury verdict in favor of a female employee in the firm's Virginia office. See Gallina vs. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, U.S. Ct. App., Nos. 03-1883 & 03-1947, slip op. at 12 (4th Cir. Feb 2, 2005) (Gallina). The jury found that, in violation of Federal antidiscrimination laws, the firm had retaliated against the employee for complaining of what she believed to be discriminatory treatment on the basis of her gender. Id. at 8. On February 11, 2005, Cherie Kiser, a member in the firm's Washington, D.C., office who chaired the firm's diversity committee, left a voicemail

message for Popeo expressing her concern that the firm in general, and section manager Gault, in particular, did not take seriously employees' complaints of gender discrimination. Popeo later spoke with Kiser, stating his commitment to combatting discrimination based on gender, but suggesting that Kiser was "overreacting" to what "she was hearing from Gault."

In March, 2005, the plaintiff underwent her annual performance review. Among her evaluators were Schroeder and Gault. She received an over-all rating of "always meets expectations" in five competencies, and an over-all rating of "usually meets expectations" in another six competencies. Each evaluator also provided written comments. Gault wrote that the plaintiff "seems very smart but [I] think the writing issues may mask some of her inherent intellectual ability." Schroeder wrote that "her writing style is too informal" and that "[s]he needs to proofread her work and pay more attention to detail." Some of the other comments were positive, including a comment from Gault that the plaintiff "[s]eems to have a pretty good substantive knowledge of a lot of general employment law areas" and from Schroeder that she "is very good with clients." In the fiscal year ending that month, the plaintiff had amassed

thirty-three more billable hours per month than the average associate.[12]

Also in March, 2005, Starr, the human resources director, and Rosemary Allen, a firm member who oversaw the firm's personnel matters, received complaints from six women that Cohen had made inappropriate comments to them.  After investigating, Starr and Allen concluded that no gender-based discrimination had taken place.

On July 20, 2005, Eastern Point Consulting Group, Inc. (Eastern Point), a consulting company hired in the wake of the Gallina case to investigate allegations of discrimination, presented the findings from its investigation to the firm. Among other things, Eastern Point reported that many female attorneys, both members and associates, "believe it is more difficult for women than men at [the firm]."  Starr was interviewed in the course of this investigation, and stated that there is a "tolerance for poor behavior" at the firm.

In September, 2005, after returning from her honeymoon, the plaintiff informed Gault that she was pregnant with her first child.  Gault responded, "Well, I suppose these things happen. I guess we have your honeymoon to blame for this?"[13]  He then

---

[12] This number was "annualized" to take into account that the plaintiff started working at the firm in the middle of the fiscal year.

[13] Gault later denied making this remark.

discussed the possibility of the plaintiff reducing her schedule to part time, although the plaintiff had not sought a reduction in hours or raised the possibility of such a reduction. Subsequently, the plaintiff experienced medical difficulties related to her pregnancy and was placed on short term disability. Gault and Schroeder exchanged electronic mail messages in January, 2006, and March, 2006, in which each expressed that he was "frustrated" with the plaintiff's absences and lack of availability. Gault also spoke to the plaintiff's neighbors and discovered that she was performing work around her house that he did not believe was consistent with the medical conditions she reported.[14]

In March, 2006, the plaintiff underwent her second annual performance review. Gault was one of her evaluators. She received over-all ratings of "usually exceeds expectations" in four competencies, "always meets expectations" in six other competencies, and a rating of "usually meets expectations" in the eleventh area, business development. In a written comment, Gault stated that, "I noted some areas of substantive knowledge and writing in my last review that needed improvement," but that he "has seen what seems to be an improvement in her work since her last evaluation." His main criticism was that "I have not

---

[14] The record contains the names of these neighbors, but does not state how Gault came to be in touch with them or the type of chores they had observed.

seen any evidence of production potential/entrepreneurial instincts."  Another member wrote "that she spent excessive time on the work" he had assigned her and that her "drafting is not particularly precise."  On the other hand, a firm member from outside ELB wrote positively that "the work [the plaintiff] did was for a very demanding client who set pretty unrealistic expectations, but [she] was able to meet them."

In a separate evaluation dated May 1, 2006, Schroeder wrote, among other things, that the plaintiff's "writing needs to improve" and that she "did not always communicate [her reduced] schedule to everyone in ELB and I had to handle a number of matters on an emergency basis."[15]

On May 3, 2006, the plaintiff gave birth to her first child.  She began a planned six-month maternity leave.  In June, 2006, defendant David Barmak replaced Gault as section manager of the ELB section.  While the plaintiff was on leave, she was informed that, based on the performance reviews she had received in March, 2006, prior to her leave, she would be subject to another, interim performance review.  This review would be based

---

[15] It is not clear from the record why Schroeder, then a senior associate, authored a separate evaluation.

on her performance during the first ninety days after her return from leave.[16]

The plaintiff returned to work on November 1, 2006. Thereafter, she registered a relatively low number of billable hours compared to other associates in the ELB section. By early February, 2007, the plaintiff had received two negative reviews of her work. One review criticized her for putting into a contract "poorly drafted language that needed to be redrafted in more conventional form." The other review, from Schroeder, noted, among other things, that she took "too much time to complete [a writing] task" he had assigned her and that "I had to perform more editing than I normally need to do for memos done by more junior associates." He also noted that "[d]espite a full-time schedule, she is coming in at 9[:]30 or so and leaving no later than 5[:]30 . . . I cannot understand why she has not attempted to step up to the plate." The plaintiff also received positive comments from a client who "was very complimentary of [the plaintiff] and [her] work."

In or around February, 2007, Allen, the member overseeing personnel matters, told Popeo, the firm chairman, that the

---

[16] The parties dispute whether other associates were subjected to a similar review. The defendants contend that other associates of the plaintiff's seniority were evaluated at around the same time to determine their potential for membership in the firm. The plaintiff contends, on the other hand, that she was not reviewed as part of the aforementioned process.

senior attorneys in the ELB section had requested that the plaintiff "be separated from the firm." Popeo, in his deposition, recalled that he proposed demoting the plaintiff, or "set[ting] her back," rather than firing her. He stated that, "I participated in the decision to step her back rather than terminate her. Indeed, I asked the Employment and Labor Section to consider an alternative to termination."

On February 23, 2007, Barmak and a member of the human resources department met with the plaintiff to inform her that she would be "stepped back" two years in seniority, which would lower her salary, but also would allow more time before any decision would be made on her eligibility for membership. According to that human resources officer, this decision was based on the plaintiff's having received "mixed reviews, [on the fact that there are] partners who won't work with her, [on] low utilization, [and on a] high billing rate." Barmak later commented, regarding this decision, that the plaintiff

> "is someone who is playing the system. She is out a lot, [and therefore] there is just a sense that she is not someone who is committed to practicing law, that she really doesn't want to be here, but as she often says, she is the 'breadwinner' . . . [and] she doesn't want to move on because of the money."

On February 26, 2007, the plaintiff retained an employment attorney in contemplation of filing a discrimination complaint against the firm. At around that time, she filed an internal

complaint alleging that the step-back was the result of gender discrimination. An internal body known as the Rapid Workforce Response Team, which included Biagetti, investigated this claim. The investigators concluded that no discriminatory conduct had taken place.

In April, 2007, the plaintiff's annual performance evaluation was completed. She received two evaluations, both strongly positive. One evaluator wrote that the plaintiff's "great work alone should help to drive more employment business to the firm."

At some point before May, 2007, while the plaintiff was working on an assignment for a client using the Desksite system, she came across an internal memorandum related to the Gallina case that discussed issues of gender discrimination at the firm. On approximately six occasions between May 8, 2007, and November 14, 2008, on instructions from her attorney, the plaintiff conducted targeted searches seeking other documents that might be related to her case or to other issues of gender discrimination. In the course of these searches, the plaintiff accessed and forwarded dozens of documents to her personal electronic mail address.[17] She shared two of those documents with her attorney.[18]

---

[17] The documents consisted of time records of various attorneys, whose workload and assignments, when compared with

In October, 2007, the plaintiff received three more evaluations, including one from Schroeder.[19]  All were strongly positive, with comments ranging from an observation that "[h]er interactions with [a specific client] have led to significantly more employment work for us," to comments from Schroeder that "[s]he has shown some very positive signs in her development over the past year and I truly look forward to working with her."  In a section for "areas for improvement," one evaluator wrote, "Nothing I can identify," a second wrote, "None that I am aware of," and Schroeder wrote, "I would like [the plaintiff] to get involved in bar association/trade association activities."

---

her own, she believed relevant to her claims; records from the study by Eastern Point; a portion of the firm's annual diversity report; documents from the Gallina case; a letter regarding another employee's claim against Cohen; a memorandum from the firm's "work allocation subcommittee"; a letter "showing that the firm was paying [a] public relations [firm] concerning [her] case"; a "talking points" memorandum regarding her case; other items concerning her case that had either been designated for public dissemination or already sent to her in final form; and a transcription of voicemail messages left for Popeo over the period from February, 2005, through December, 2005.  Though the plaintiff's electronic searches turned up additional apparently-confidential documents, she did not forward these additional documents to herself or to her attorney, nor did she "review" them.

[18] The two documents the plaintiff shared with her attorney were the letter regarding the claim of another employee against Cohen and the transcription of Popeo's voicemail messages. Later, she "provided all the documents to her counsel only in response to a request for production of documents made by the firm in the course of discovery" in her subsequent civil suit.

[19] It is not clear from the record what occasioned these evaluations.

Also in October, 2007, the firm solicited "upward feedback" from associates, in which they would provide anonymous comments evaluating members with whom they had worked.  Cohen and Biagetti each received feedback stating that associates were concerned about their behavior towards women.

On December 11, 2007, the plaintiff filed a complaint with the MCAD alleging that her step-back was as a result of gender discrimination.  She named the firm, Barmak, Gault, and Schroeder as respondents.

In February, 2008, the plaintiff took a second maternity leave, returning to work on September 3, 2008.

On November 13, 2008, the plaintiff conducted another search of the public section of Desksite seeking documents related to gender discrimination at the firm.  She found the transcript of voicemails left for Popeo over the period from February, 2005, through December, 2005, which she immediately copied and later forwarded in its entirety to her attorney.[20] The transcript had been prepared by Popeo's administrative assistant and, pursuant to his usual practice, saved to the public section of Desksite.  Among the messages was the one described above, in which firm member Kiser criticized the behavior of Gault during a meeting about gender discrimination.

---

[20] The record does not reflect when the plaintiff forwarded the transcript to her attorney.

Many of the other messages were from Popeo's clients or potential clients and concerned sensitive matters protected by rules of attorney-client confidentiality and privilege.

Also in November, 2008, in the wake of the national economic slowdown, the firm prepared to lay off employees. The plaintiff, among other associates, was selected for layoff. According to the firm, this was because of her low rate of billable hours, adjusted for the time that she had been on maternity leave. The plaintiff asserts that the low number of billable hours was the result of the "discriminatory and retaliatory conduct of" defendants who either did not assign work to her or discouraged others from doing so. On November 20, 2008, counsel for the firm contacted the plaintiff and offered to settle her discrimination case if she would accept the layoff. The plaintiff rejected this offer on November 21, 2008, and she was not then laid off. On the same day that the plaintiff rejected this offer, she visited the office of another firm member and showed the member a portion of the voicemail transcript containing messages left for Popeo. The member contacted Popeo. Thereafter, the firm's information technology department reviewed its records and learned that the plaintiff had conducted a number of searches of Desksite that appeared to be related to her litigation against the firm. On November 25, 2008, after consulting with Allen and Starr, Popeo

directed that the plaintiff's employment be terminated for cause. On December 5, 2008, Popeo filed a complaint with the Board of Bar Overseers (board), claiming that the plaintiff's searches of Desksite in order to advance her litigation against the firm was a violation of her ethical duties as an attorney.[21]

On September 2, 2009, the plaintiff filed a second complaint with the MCAD, alleging that the firm, in terminating her employment, had discriminated against her on the basis of her gender and that it had retaliated against her for having filed her first MCAD complaint. On November 3, 2009, the plaintiff brought the present action in the Superior Court, naming the firm, Gault, Barmak, and Schroeder as defendants. In January, 2010, she filed an amended complaint naming Popeo and Cohen as defendants. In February, 2010, the defendants filed an answer and counterclaims. In November, 2011, the defendants moved to dismiss on the basis of the plaintiff's asserted misconduct, i.e., her acquisition of documents by searching Desksite. That motion was denied in July, 2012.

---

[21] On November 20, 2011, a hearing committee of the Board of Bar Overseers (board) issued a report concluding that the plaintiff had violated her ethical duties and recommending that her license to practice law be suspended for thirty days. The board reviewed the hearing committee's conclusion and determined that the plaintiff had not violated any rule of professional conduct. On August 6, 2012, a single justice of the county court adopted the board's recommendation.

In January, 2013, the parties filed cross motions for summary judgment. The motion judge granted the defendants' motion and dismissed all of the plaintiffs' claims. Regarding the plaintiff's claim that the step-back was discriminatory, he concluded that she could not establish at trial that the firm's "reason for offering [her] a step-back rather than membership consideration . . . [was] pretextual; there is no evidence that it was designed to hide a discriminatory motive." Similarly, the judge concluded that the plaintiff could not show that her termination was discriminatory because "there is no evidence that Mr. Popeo's decision to terminate [her] employment . . . was truly motivated by a desire to terminate her due to her gender or her pregnancies."

With respect to the claim that the step-back was retaliatory, the judge concluded that

> "[t]here is no evidence that the step-back option was designed to retaliate against [the plaintiff] for her complaints over a year earlier with regard to Mr. Cohen. Similarly, given that [the firm's] and Mr. Popeo's stated reason for [the plaintiff's] termination was her inappropriate conduct during her employment, [she] cannot overcome her burden to demonstrating that the reason for her termination was a pretext, and that the real reason was to retaliate against her protected activity under G. L. c. 151B."

He also concluded that the claims against Gault, Schroeder, and Cohen were time barred because their allegedly discriminatory acts took place outside the relevant limitations periods.[22]

2. Discussion. The plaintiff maintains that the judge erred in granting the defendants' motion for summary judgment on her claims of gender discrimination under G. L. c. 151B, § 4; her claims of retaliation under G. L. c. 151B, § 4; and her common-law claim of tortious interference with contractual relations.[23]

---

[22] In particular, with regard to the statutory claims against Gault and Schroeder, the judge concluded that the allegedly discriminatory acts took place more than 300 days before the plaintiff filed her first complaint with the Massachusetts Commission Against Discrimination. See G. L. c. 151B, § 5. With regard to the common-law claim against Cohen, the judge concluded that the relevant acts had taken place more than three years before the plaintiff filed her civil suit. See G. L. c. 260, § 2A.

[23] As noted, the complaint also included an allegation of pregnancy discrimination. We do not address this count separately because the evidence discussed infra regarding gender discrimination includes evidence of pregnancy discrimination, and because pregnancy discrimination is itself a form of gender discrimination. See Massachusetts Elec. Co. v. Massachusetts Comm'n Against Discrimination, 375 Mass. 160, 167 (1978). Moreover, the plaintiff presented claims for "aiding and abetting discrimination" (against all of the individual defendants except Cohen) and for "failure to investigate and remedy discrimination" (against the firm). These claims are "entirely derivative of the discrimination claim[s]" (citation omitted). See Lopez v. Commonwealth, 463 Mass. 696, 713 (2012). Therefore, to the extent that judgment should not have entered on the discrimination claims, it should not have entered on these derivative claims.

We review a motion for summary judgment de novo. "In considering a motion for summary judgment, we review the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. The defendants, as the moving parties, have the burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law." Drakopoulos v. U.S. Bank Nat'l Ass'n, 465 Mass. 775, 777 (2013).

a. Discrimination claims. The plaintiff claims that both her demotion and her termination constituted discrimination on the basis of gender.

General Laws c. 151B, § 4 (1), provides that "[i]t shall be an unlawful practice: [f]or an employer, by himself or his agent, because of the . . . sex . . . of any individual . . . to discharge from employment such individual or to discriminate against such individual . . . in terms, conditions or privileges of employment." This provision applies by its terms only to an "employer." G. L. c. 151B, § 4 (1). Nonetheless, individuals, whether supervisors, fellow employees, or third parties, also may be held liable by provisions that forbid "any person . . . to . . . interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter," G. L. c. 151B, § 4 (4A), and that prohibit "any person, whether an employer or an employee or not, to aid [or] abet . . . the

doing of any of the acts forbidden under this chapter."  G. L. c. 151B, § 4 (5).  See Lopez v. Commonwealth, 463 Mass. 696, 706 (2012).

To survive summary judgment on claims brought under these provisions, an employee-plaintiff must produce evidence from which a reasonable jury may infer "four elements:  membership in a protected class, harm, discriminatory animus, and causation." Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001) (Lipchitz). The "question here is whether the plaintiff provided evidence from which a reasonable jury could infer the presence of the latter two elements, i.e., that the defendants bore discriminatory animus and that the animus was the reason the defendants [took adverse action with respect to] the plaintiff's employment."  See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680 (2016) (Bulwer).

Because employees rarely can produce direct evidence of discriminatory animus and causation, see Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 (2005), they may survive a motion for summary judgment by producing "indirect or circumstantial evidence [of these elements] using the familiar three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973) (McDonnell Douglas)."  Sullivan v. Liberty Mut. Ins. Co., supra at 39-40. "In the first stage, the plaintiff" must produce evidence of "a

prima facie case of discrimination," which would allow a jury to infer that "(1) [s]he is a member of a class protected by G. L. c. 151B; (2) [s]he performed [her] job at an acceptable level; [and] (3) [s]he was terminated" or otherwise subjected to an adverse employment action. Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441 (1995) (Blare). In the second stage, the burden of production shifts to the employer to "articulat[e] a legitimate, nondiscriminatory reason for its hiring decision." Id. At the final stage, the burden of production shifts back to the employee to produce evidence that "the employer's articulated justification [for the adverse action] is not true but a pretext."[24] Id. at 443.

Because "Massachusetts is a pretext only jurisdiction," id., an employee may survive summary judgment by producing evidence "that the respondent's facially proper reasons given for its action against him [or her] were not the real reasons

---

[24] The employee's burden at this third stage is not, as it has sometimes been described, "to demonstrate that there is a genuine issue of material fact whether the defendant's proffered reason . . . lack[s] reasonable support in evidence or is . . . wholly disbelievable" (quotation and citation omitted). Bulwer v. Mount Auburn Hosp., 86 Mass. App. Ct. 316, 347 (2014) (Sikora, J., dissenting), S.C., 473 Mass. 672 (2016). This language comes originally from Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 138 (1976), and refers to the employer's burden at the second stage of the burden-shifting paradigm. Id. (employer does not satisfy burden at second stage if it "gives an explanation for a hiring decision which has no reasonable support in the evidence or is wholly disbelieved").

for that action," <u>Wheelock College</u> v. <u>Massachusetts Comm'n Against Discrimination</u>, 371 Mass. 130, 139 (1976), even if that evidence does not show directly that the true reasons were, in fact, discriminatory. See <u>Bulwer</u>, <u>supra</u> at 681-682; <u>Lipchitz</u>, <u>supra</u> at 500-501. Such indirect evidence is sufficient at the summary judgment stage because, "[c]ombined with establishment of a prima facie case . . . a showing of pretext eliminates any legitimate explanation for the adverse hiring decision and warrants," but does not require, "a determination that the plaintiff was the victim of unlawful discrimination." <u>Blare</u>, <u>supra</u> at 446. Under this familiar three-part test,

> "[w]hile the plaintiff does bear 'the burden of producing evidence' that the employer's reasons are pretextual, . . . the burden of persuasion at summary judgment remains with the defendants, who, 'as the moving part[ies], "ha[ve] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [they] would not have the burden on an issue if the case were to go to trial"'" (citations omitted).

<u>Bulwer</u>, <u>supra</u> at 683.

i. <u>Genuine issues of material fact</u>. Here, the plaintiff has offered indirect evidence that the "step-back" and the termination of her employment were discriminatory, and we therefore use this three-stage burden-shifting paradigm to determine whether there is sufficient evidence of discriminatory intent for the plaintiff to survive a motion for summary judgment. The defendants concede, with regard to the first

stage of this paradigm, that the plaintiff has made out a prima facie case of discrimination.[25]  With regard to the second stage, the defendants maintain that the plaintiff's "step-back" was based on her having received "mixed reviews, [on the fact that there were] partners who [would not] work with her, [on] low utilization, [and on a] high billing rate."  The defendants contend further that the subsequent decision to terminate the plaintiff's employment was based on the "good faith" belief that she had "violated [f]irm policies and [her own] ethical duties." This satisfies the defendants' burden to articulate nondiscriminatory reasons for their decisions.  We arrive, therefore, at the third stage, where we "consider whether the plaintiff has provided evidence sufficient to allow a reasonable jury to infer that 'the employer's articulated justification is not true but a pretext'" (citation omitted).  See Bulwer, supra at 683.

(1) Evidence regarding step-back demotion.  We begin by considering evidence that relates to the plaintiff's step-back. There are at least four categories of evidence from which a reasonable jury might infer that the reasons offered by the defendants for the adverse employment decision were pretextual.

---

[25] This concession is "for purposes of summary judgment only."

First, the plaintiff points to specific instances in which "similarly situated [male] employees were treated differently" from the way she was. See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129 (1997) (Matthews) (such evidence is "most probative means of establishing that the plaintiff's termination was a pretext"). For instance, defendant Schroeder's May, 2006, evaluations criticized the plaintiff for not being available for certain emergency assignments, and his March, 2006, electronic mail message noted that "[t]his is not a job where you can come and go as you please." Yet, the plaintiff maintains in an affidavit there were "many occasions when [she] would be looking for Mr. Schroeder during business hours and would learn that he and [a particular junior male associate] were at the gym." Similarly, when the plaintiff was nursing her first child, Schroeder evaluated her negatively for "leaving [the office] no later than 5[:]30," even as Schroeder "was sending [the aforementioned male associate] home" earlier than the plaintiff because he had "a wife and kid at home."

Second, there is evidence that Cohen attempted to undermine the plaintiff after she complained about his behavior, which may allow an inference that the plaintiff's perceived performance deficiencies resulted in part from Cohen's animus rather than from innate inadequacy. See generally Casarez v. Burlington N./Santa Fe Co., 193 F.3d 334, 338 (5th Cir. 1999), rehearing

denied, 201 F.3d 383 (5th Cir. 2000) (evidence of pretext where supervisor undermined employee's performance); 1 Larson, Employment Discrimination § 8.04 at 8-85 (2d ed. 2015) ("employer's proffered justification for its action may also be shown to be pretextual if the respect in which the employee is allegedly deficient is of the employer's own making"). While Cohen initially complimented the plaintiff's work,[26] this changed following her August, 2004, complaints, when she was told by various individuals that Cohen was "bad-mouthing" her. In October, 2004, Cohen asked a client to submit a written complaint against the plaintiff, which he then forwarded to Gault, the ELB section manager, and Starr, the human resources director. Cohen stated in his deposition that he had never previously solicited a written complaint against an associate. In January, 2005, Cohen gave the plaintiff a lengthy assignment that did not count toward her quota of billable hours, which the plaintiff maintained in her deposition was more extensive than

---

[26] In his deposition, Cohen said that the plaintiff's work in July, 2004, involving the drafting of a brief for a client, was deficient, both in its quality and because she did not work over the Fourth of July weekend to address those deficiencies. Cohen states also that he "can't say that" he conveyed these criticisms to the plaintiff at the time. Whether to accept Cohen's assertion that he believed the plaintiff's work to be deficient therefore requires a credibility assessment best left to the finder of fact.

parallel assignments given to other associates.[27]  In the wake of these incidents, a number of firm members, including Gault, told human resources staff during a meeting in February, 2005, that the plaintiff and Cohen could not work together and that Starr should seek to hire an attorney with qualifications similar to the plaintiff's.

Third, "a reasonable jury could interpret a number of the [criticisms made by] the plaintiff's evaluators and supervisors as reflecting '[s]tereotypical thinking . . . categorizing people on the basis of broad generalizations.'"  Bulwer, supra at 686, quoting Lipchitz, supra at 503 n.16.  Such statements, "when considered with [other] evidence of disparate or unfair treatment, . . . may lend support to" the contention that the adverse employment action was made on an impermissible basis. Bulwer, supra at 686.

In particular, Barmak, who replaced Gault as manager of the ELB section, described his "impression" that the plaintiff did not have a high "level of commitment to her professional development and interest in advancement and was more concerned about somehow . . . potentially pursuing a [discrimination] claim."[28]  When the plaintiff was pregnant for the first time,

---

[27] Gault and Cohen dispute that the assignment was either punitive or disproportionate to that given to other associates.

[28] Schroeder also stated in his deposition that the plaintiff was one of those "people who are caregivers who aren't

Gault sent a colleague an electronic mail message questioning her commitment to her work, noting that she was "out a lot [which she] says [is] attributable to her medical condition tho[ugh] I just got an e-mail re[garding] her taking about [four] days off . . . which I assume is vacation."[29]  Schroeder wrote that he was "getting frustrated" because he "cannot give work to someone [like the plaintiff] when I don't know if they are going to here on any given day."  While "[t]hese kinds of comments can, of course, admit of different interpretations by a jury," see Bulwer, supra at 687, they could be understood to reflect a stereotypical view of women as not committed to their work because of family responsibilities.  See Massachusetts Elec. Co. v. Massachusetts Comm'n Against Discrimination, 375 Mass. 160, 168 (1978) (noting "stereotype that women belong at home raising a family rather than at a job as permanent members of the work force").

Finally, there is evidence that women at the firm, and in the ELB section in particular, were subject to discriminatory treatment.  See Matthews, supra at 130 n.4 ("evidence which may

_____

being discriminated against but who wish to obtain some leverage or benefit from their employers."

[29] Similarly, after Gault found out that the plaintiff was pregnant for the first time, he immediately suggested that she consider "alternate work arrangements," apparently assuming that she would not be able to continue full-time work while pregnant or a new mother.

be relevant to the plaintiff's showing of pretext may include the employer's general practice and policies concerning" other members of protected class).

For example, the 2005 study by Eastern Point found that

"[m]any female [attorneys] . . . believe it is more difficult for women than men at Mintz. In particular, they indicated that they are not given the same assignments or opportunities for exposure that men receive, there are fewer women in management for them to look up to or receive support from, and male partners make assumptions about the ability and willingness of women to do certain work."

The report also indicated that "[m]any female and of color respondents believe that white men in the firm have a support network amongst themselves and that it is more comfortable and familiar within the firm for them." Similarly, in a voicemail message for defendant Popeo, firm member Kiser said that, "with respect to these kinds of employment [discrimination] complaints, . . [w]e . . . [cannot] stick our heads in the sand. We have done that for too long and that is what the problem is."

Moreover, there is evidence that such disparate treatment was practiced by some of the same members who wrote the plaintiff's evaluations and investigated her discrimination complaints. Cohen's 2007 "upward feedback" included comments that "[h]e has engaged in harassing and inappropriate behavior toward many women" and that "[h]e indicates a clear bias against women in the workplace." Biagetti, the firm's managing member to whom the plaintiff initially brought her concerns, received

"feedback" that he "has different standards for men and women" and that he "judges women's work more harshly, and is less appreciative of women's work."[30]  Kiser described Gault as responding to gender discrimination complaints by being "extremely defensive" and taking "the posture that somehow [the] complaints were not legitimate."  Kiser also stated that Gault was not "capable" of "separating himself from his own personal involvement and possibly his own personal feelings on such matters."

According to the Eastern Point survey, many employees believed that disparate treatment affected "negatively . . . the firm's ability to retain women."  Statistics in the record support these assertions.  When the plaintiff joined the firm, there were five female associates and four male associates in the Boston ELB section senior to her in terms of the year they had graduated from law school.  Of those, all of the men were promoted to member, while none of the women were.[31]  "[T]o the extent [these numbers] suggest that the highest ranks of [the]

---

[30] Other feedback comments included that Biagetti "has been known to . . . punish associates for . . . standing up to him (especially women)" and that "when he asks a question and a male associate hesitates before answering, he perceives that pause as thoughtful," whereas "[w]hen a female associate does the same thing, he perceives the pause as weakness and uncertainty."

[31] The defendants counter that, in citing these numbers, the plaintiff "fails . . . to acknowledge individual decisions [by these women] to pursue other opportunities."  The defendants' interpretation might ultimately prevail, but the question is one for the finder of fact.

employer's organization are closed to members of a protected class, they may support an inference that the particular decision[s]" in question here were "tainted by an unlawful bias." Lipchitz, supra at 508-509 ("evidence indicat[ing]" dearth of "women in the corporate ranks of the company" is "relevant, and may be properly introduced in a disparate treatment case").

(2) Evidence regarding termination. We turn to the termination of the plaintiff's employment in November, 2008. Given that the termination decision was made by Popeo soon after he discovered that the plaintiff had copied confidential documents, Popeo's explanation -- that he fired the plaintiff for taking those documents -- is doubtless plausible.

Nonetheless, there is evidence that Popeo's decision was in fact motivated by other considerations. For example, it is clear that he was kept informed, throughout the plaintiff's employment, of the plaintiff's discrimination claims and her performance deficiencies. He was told in the summer of 2004 of her discrimination complaints, apparently kept a file on her case in his office, and was involved in the decision to require her step-back. Even the decision to terminate her employment was not made by Popeo individually, but in consultation with Starr, the human resources director, and Allen, the member in charge of personnel matters, who themselves consulted regularly

with ELB members regarding the plaintiff.  Finally, the plaintiff's employment was terminated only a few weeks after she was selected for layoff, five days after the firm had offered to settle her claims in exchange for her agreement to a lay-off, four days after the plaintiff had rejected that offer, and one day after Popeo had been informed of her decision in that regard.  All of this would allow -- although, of course, not require -- a jury to infer that the incident with the documents merely provided an excuse to fire an employee who had long been viewed negatively by her supervisors, but who would not leave the firm voluntarily and who could not otherwise be terminated because of her pending discrimination claims.

ii.  Defendants' contentions.  The defendants contend that, the above evidence notwithstanding, they are nonetheless entitled to summary judgment for several reasons.  First, they note that the adverse employment decisions in question were made by individuals who were acting independently from the plaintiff's immediate supervisors and who were not accused of harboring the discriminatory views alleged to have been held by those supervisors.  In particular, they point out that the decision to "step-back" the plaintiff's seniority was made formally by Allen, the member who oversaw personnel matters, and Starr, the human resources director, neither of whom was accused of harboring discriminatory views.  Similarly, the termination

decision was made by the chairman of the firm, Popeo, who did not author any of the allegedly discriminatory evaluations or otherwise evaluate the plaintiff's work. In this regard, the defendants note that a "third [party]'s independent decision to take adverse action breaks the causal connection between [any] retaliatory or discriminatory animus and the adverse action." See Mole v. University of Mass., 442 Mass. 582, 598 (2004).

The defendants cannot be excluded from liability on this basis. Because Allen and Starr did not supervise the plaintiff's work, they based their decision to require a "step-back" on the opinions of the plaintiff's supervisors and evaluators. Similarly, Popeo decided to terminate the plaintiff's employment only after consulting with Starr and Allen, and after having been kept apprised, during the preceding months and years, of the negative views of the plaintiff's supervisors. "Where 'the decision makers relied on the recommendations of supervisors [whose motives have been impugned], the motives of the supervisors should be treated as the motives for the decision. . . . An employer [may not] insulate its decision by interposing an intermediate level of persons in the hierarchy of decision, and asserting that the ultimate decision makers acted only on [the] recommendation'" of others. Bulwer, supra at 688, quoting Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 569-570

(1981).  See <u>Staub</u> v. <u>Proctor Hosp</u>., 562 U.S. 411, 420 (2011) (rejecting view that "the employer [is] effectively shielded from discriminat[ion]" claims when it "isolates a personnel official from an employee's supervisors, vests the decision to take adverse employment actions in that official, and asks that official to review the employee's personnel file before taking the adverse action").

Second, the defendants contend that summary judgment was appropriate because the plaintiff's case rests on "conclusory allegations, improbable inferences, and unsupported speculation."  See <u>Medina-Munoz</u> v. <u>R.J. Reynolds Tobacco Co</u>., 896 F.2d 5, 8 (1st Cir. 1990).  As presented in the defendants' brief, this contention, at bottom, is that, because the plaintiff proffers no direct evidence of discriminatory motive, her claims must fail.  By definition, however, where a discrimination claim is based on indirect evidence, "the process of arriving at an ultimate finding of unlawful discrimination will require an element of inference to tie the evidence of unlawful discrimination to the employment decision."  <u>Johansen</u> v. <u>NCR Comten, Inc</u>., 30 Mass. App. Ct. 294, 299 (1991).  Where, as here, the required inferences are reasonable, it "is not for a court to decide on the basis of [briefs and transcripts]" whether they are correct, "but is for the fact finder after weighing the circumstantial evidence and assessing the

credibility of the witnesses." Lipchitz, supra at 499, quoting Blare, supra at 445.

Finally, the defendants argue that the claims against Gault and Schroeder are time barred because the underlying acts took place more than 300 days before the plaintiff filed her first MCAD complaint.[32] See G. L. c. 151B, § 5 (complaint must be "filed within 300 days after the alleged act of discrimination"). This contention, too, is unavailing. An employer may "be exposed to . . . liability for harms stemming from discriminatory evaluations [even] some years after the evaluations were conducted, if the evaluations first cause tangible harm to the employee at that later point." Thomas v. Eastman Kodak Co., 183 F.3d 38, 50-51 (1st Cir. 1999), cert.

---

[32] The defendants contend, further, that the claims against Gault and Schroeder must fail because both were involved in hiring the plaintiff, making it unlikely that they harbored any animus towards her on account of her gender. While this inference may be plausible, for the court to draw it on summary judgment would be inconsistent with the requirement that we "draw all reasonable inferences in the light most favorable to the" plaintiff. See Drakopoulos v. U.S. Bank Nat'l Ass'n, 465 Mass. 775, 777 (2013). We note as well that the plaintiff was neither married nor a mother at the time she was hired. See Tellepsen Pipeline Servs. Co. v. National Labor Relations Bd., 320 F.3d 554, 569 (5th Cir. 2003) ("underlying assumption that discriminatory intent would be manifest at the time of hiring can be overcome where there is change in circumstances between the time of hiring and firing"). See also Martin, Immunity for Hire: How the Same-Actor Doctrine Sustains Discrimination in the Contemporary Workplace, 40 Conn. L. Rev. 1117, 1117 (2008) ("same-actor inference" is "incongruen[t] with both cognitive psychological research and the social dynamics of the workplace").

denied, 528 U.S. 1161 (2000). Here, the plaintiff timely filed her first MCAD complaint within 300 of her step-back, which was the point "when [the negative] evaluation[s] [were first] applied to deny the plaintiff particular benefits or positions" (citation omitted), id. at 50, and therefore, the point when her "claim[s] accrue[d]" (citation omitted). Id.

b. _Retaliation_. The plaintiff also claims that both the step-back and the termination were retaliation for the "protected activity" of complaining of gender discrimination.[33]

i. _In general_. A claim of retaliation is separate and distinct from a claim of discrimination. Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 121 (2000). An employee bringing a retaliation claim is not complaining of discriminatory treatment as such, but rather of treatment that "punish[es]" her for complaining of or otherwise opposing such discriminatory treatment. Ruffino v. State St. Bank & Trust

_____

[33] While the plaintiff refers to this claim as one for "retaliation," G. L. c. 151B "does not actually use the word 'retaliation'" in describing forbidden employment practices. Psy-Ed Corp. v. Klein, 459 Mass. 697, 706 (2011). Rather, the statute forbids "any person [or] employer . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter," G. L. c. 151B, § 4 (4), and also forbids "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter." G. L. c. 151B, § 4 (4A). The word "retaliation" is merely "shorthand" that "[c]ourts commonly use . . . for the more detailed wordings of antidiscrimination statutes such as" G. L. c. 151B, § 4 (4A). Psy-Ed Corp. v. Klein, supra at 706 n.24.

Co., 908 F. Supp. 1019, 1040 (D. Mass. 1995).  For this reason, a "claim of retaliation may succeed even if the underlying claim of discrimination fails, provided that in asserting her discrimination claim, the claimant can 'prove that [she] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination'" (alterations original).  Psy-Ed Corp. v. Klein, 459 Mass. 697, 706-707 (2011) (Psy-Ed), quoting Abramian v. President & Fellows of Harvard College, supra at 121.

To survive summary judgment on a claim of retaliation, an employee must produce evidence from which a jury could infer four elements.  First, there must be evidence that the employee "reasonably and in good faith believed that the employer was engaged in wrongful discrimination."  Pardo v. General Hosp. Corp., 446 Mass. 1, 21 (2006).  Second, there must be evidence that the employee "acted reasonably in response to that belief," id., through reasonable acts meant "to protest or oppose . . . discrimination" (protected activity).  See Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir. 2009).  Third, there must be evidence that the employer took adverse action against the employee.  See Pardo v. General Hosp. Corp., supra.  Finally, there must be evidence that the adverse action was a response to the employee's protected activity (forbidden motive).  See id.

Employees claiming retaliation do not often possess direct evidence of the fourth element, a forbidden motive.  See, e.g., Psy-Ed, supra at 707.  Therefore, they may prove a forbidden motive with indirect evidence, which courts evaluate using a three-stage burden-shifting paradigm similar to the one discussed in McDonnell Douglas, supra.  See Psy-Ed, supra.  At the first stage, the employee has the burden of producing evidence "that [s]he engaged in protected conduct, that [s]he suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action'" (citation omitted).  Mole v. University of Mass., 442 Mass. 582, 591-592 (2004) (Mole).  At the second stage, the "employer must then articulate a legitimate, nondiscriminatory reason for" the adverse employment decision.  Esler v. Sylvia-Reardon, 473 Mass. 775, 780 n.7 (2016).  At the third stage, the employee must produce evidence that the employer's "stated reason for [its adverse action] was a pretext for retaliating against her on account of her" protected activity.  Id.  The combination of a "prima facie case" of retaliation with "a showing of pretext" allows a jury to infer that there was no "legitimate explanation for the adverse [employment] decision" and that the employer's true motivation was retaliatory.  See Blare, supra at 446.

ii.  Step-back.  We turn to the plaintiff's claim that her step-back was retaliatory.  It is undisputed that, for purposes

of summary judgment, the plaintiff has satisfied three of the four elements of a retaliation claim. In particular, the parties agree that the plaintiff reasonably and in good faith believed that she suffered discrimination; that she engaged in protected activity by complaining internally of that alleged discrimination; and that, in the form of the step-back, she suffered an adverse employment action.

The parties dispute, however, whether there is sufficient evidence of the fourth element -- a forbidden motive -- which requires proof that the plaintiff's protected actions were the reason the firm imposed the step-back. The plaintiff's contention in this regard, relying as it does on indirect evidence, must be analyzed using the three-stage burden-shifting paradigm discussed above. See Psy-Ed, supra. The defendants argue that the plaintiff fails at both the first and third stages of this paradigm.

As to the first stage, where the plaintiff must make out a prima facie case of retaliation, the defendants contend that the plaintiff has not presented evidence that "a causal connection existed between [her] protected conduct" -- i.e., her internal discrimination complaints -- and the step-back. See Mole, supra at 592 (citation omitted). They note that the step-back took place in February, 2007, approximately two and one-half years after the plaintiff engaged in the protected activity of

complaining about the behavior of Cohen and Gault.  See id. at 595 (no causal connection where "time span between . . . protected activity and the later adverse actions is too long to support [the] desired inference of causation").

This contention fails because the plaintiff is not seeking to prove a "causal connection" through the temporal proximity of her protected acts to the adverse action she suffered.  Instead, noting that "[t]emporal proximity is but one method of proving retaliation," Chungchi Che v. Massachusetts Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003), the plaintiff presents "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action," which "can be sufficient to show a causal connection" between the two (citations omitted).  Mole, supra at 596, quoting Chungchi Che v. Massachusetts Bay Transp. Auth., supra.  From such evidence, a jury may, though need not, infer that the "pattern of retaliatory conduct [began] soon after [the protected activity] and only culminate[d] later in actual" adverse action.  Mole, supra at 596, quoting Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir.), cert. denied, 518 U.S. 1019 (1996).

Here, the plaintiff first engaged in protected conduct in the summer of 2004, when she complained of gender discrimination to human resources officers and firm members.  See Abril-Rivera

v. Johnson, 806 F.3d 599, 608 (1st Cir. 2015) (it is protected activity to "complain about unlawfully discriminatory employment practices"). Following that protected conduct, and before the February, 2007, step-back, there is evidence, delineated supra, that the plaintiff was treated differently from similarly-situated male colleagues, that her evaluators may have judged her through the lens of a stereotype, and that Cohen, her boss, tried to undermine her. From this evidence, a jury could, but need not, infer that a "pattern of retaliatory conduct [began] soon after [the protected activity] and only culminate[d] later in actual" adverse action (citation omitted). Mole, supra at 596.

Given that the plaintiff has made out a prima facie case of retaliation, we move to the second stage, where the defendants must provide a lawful explanation for their adverse action. Here, they have done so, explaining that the step-back was based on the plaintiff's having received "mixed reviews, [on the fact that there are] partners who won't work with her, [on] low utilization, [and on a] high billing rate."

We therefore move to the third stage, where the plaintiff must present evidence that the defendants' lawful explanation is pretextual. Although the defendants contend that the plaintiff can point to no such evidence, that is incorrect. As described supra, the plaintiff has presented evidence from which a jury

might infer that a "pattern of retaliatory conduct [began] soon after" she complained of gender discrimination, "culminat[ing] later in" her step-back.  See Mole, supra at 596; Chungchi Che v. Massachusetts Bay Transp. Auth., supra at 39 (inference of pretext from evidence of disparate treatment in wake of protected activity).  From this, a jury may, but need not, infer that the plaintiff's perceived performance deficiencies were merely a cover, and that the step-back actually was motivated by her protected actions.  This suffices to defeat the defendants' motion for summary judgment as it concerns the step-back.

    iii.  Termination.  We turn now to the plaintiff's claim that her termination was retaliatory.  The plaintiff presents two arguments in support of this contention.  First, she maintains that she was fired on the basis of a forbidden motive, i.e., for having engaged in the protected activity of filing discrimination complaints with the firm, before the MCAD, and in the Superior Court.[34]  She argues that the defendants' proffered explanation -- that they fired her for accessing, copying, and forwarding confidential documents in pursuit of her

_____

    [34] There is no dispute, for purposes of summary judgment, that the plaintiff has satisfied the other components of a retaliation claim.  In particular, the parties agree that the plaintiff reasonably and in good faith believed that she suffered discrimination; that she engaged in protected activity by complaining of that alleged discrimination by filing complaints internally, at the MCAD, and in the Superior Court; and that, in the form of the termination, she suffered an adverse employment action.

discrimination claim (self-help discovery) -- is not the actual reason for her termination, but rather a pretext. Second, she contends that her acts of self-help discovery themselves constituted protected activity, such that, even if the defendants' proffered explanation were true, they would not be absolved of liability.

(1) Pretext. As mentioned, the plaintiff argues that she was fired for having engaged in the protected activity of filing discrimination complaints, and that the reason the defendants offered for her termination -- that she accessed, copied, and forwarded documents in violation of company policy and ethical rules -- was pretextual. Because the plaintiff does not claim to possess direct evidence that the firm's proffered explanation was false, we analyze her claim, as we do all claims involving indirect evidence of forbidden motive, using the three-stage burden-shifting paradigm described supra. The defendants contend that the plaintiff fails at both the first and third stages of the paradigm.

At the first stage, where the plaintiff must make out a prima facie case of retaliation, the contested issue is whether the plaintiff has produced sufficient evidence of a causal connection between the adverse action taken by Popeo (termination) and her protected activity (pursuing gender-discrimination complaints internally, at the MCAD, and in a

court). In this regard, the plaintiff notes that Popeo fired her on November 25, 2008, a few weeks after she had been selected for lay-off, five days after the firm had offered to settle her claims in exchange for her agreement to the lay-off, four days after she had rejected that offer, and one day after Popeo had been informed of her decision to reject the offer. The temporal proximity between the firm's lay-off decision, the plaintiff's decision not to settle her case, and the plaintiff's termination is one form of "circumstantial evidence that . . . can demonstrate" the required causal connection. See Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992).

The plaintiff also points to more direct evidence of Popeo's motivation. For instance, she notes Popeo's stated view that "you don't stay employed by a firm for the purpose of enhancing the value of your case as opposed to enhancing your career." She further notes that Popeo consulted with Starr and Allen, who held views that the plaintiff might have been "falling back on claims of discrimination" and that she was "looking for issues to sue us on," about the termination decision. While this evidence is capable of different interpretations, it would allow a jury to infer that Popeo fired the plaintiff not because of her unethical activity as such, but

because of his view that the plaintiff should not remain at the firm while continuing to pursue her discrimination claims.

This evidence also allows an inference, as required at the third stage of the burden-shifting analysis, that the defendants' stated reason for firing the plaintiff -- her acts of self-help discovery -- was pretextual. In particular, it would allow a jury to infer that Popeo fired the plaintiff because she pursued her discrimination claims while refusing to accept the firm's settlement offer, and that he cited her perceived ethical violations merely as a cover for that unlawful motive. See Psy-Ed, supra at 711-712 (pretext proved by combination of temporal proximity and direct evidence). Summary judgment on this claim was, therefore, inappropriate.

(2) Self-help discovery. As noted, the plaintiff contends that, even if the defendants' proffered reason for firing her -- that she engaged in self-help discovery in support of her discrimination claims -- ultimately is determined to be the real reason, it is nonetheless unlawful, because her acts of self-help discovery constituted protected activity under G. L. c. 151B. We need not address this contention, as it is relevant only to the plaintiff's claim that her termination was retaliatory, and we have determined that the defendants are not entitled to summary judgment on that issue. That being said, because the issue may arise at trial, has been "fully

briefed . . . and concern[s] matters of important public policy that are likely to recur," Matter of the Receivership of Harvard Pilgrim Health Care, Inc., 434 Mass. 51, 56 (2001), we address whether self-help discovery in this context may constitute protected activity.  We do not, however, make any determination regarding the plaintiff's actions in this case, a matter that is for the trial court judge to resolve as and when appropriate.

The question whether an employee's acts of self-help discovery in aid of claims under G. L. c. 151B, § 4, may ever, under any circumstances, constitute protected activity is one of first impression for this court.  Taking into consideration the interests at stake and the views of other courts that have addressed the matter, we conclude that such conduct may in certain circumstances constitute protected activity under that statute, but only if the employee's actions are reasonable in the totality of the circumstances.  See Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 725 (6th Cir. 2008) ("oppositional activity must be reasonable in order to receive protection").  As the New Jersey Supreme Court recognized, it is best to take "a flexible, totality of the circumstances approach that rests on consideration of a wide variety of factors, all of which must be balanced in order to achieve the essential goals embodied in" our antidiscrimination laws.  See Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 269 (2010) (Quinlan).

Taking this approach requires a determination, based on the facts of each case, whether the employee's actions were "reasonable under the circumstances" and, as a result, constituted protected conduct under G. L. c. 151B.[35] See Niswander v. Cincinnati Ins. Co., supra. In this way, we strike a careful "balance . . . between the employer's recognized, legitimate need to maintain an orderly workplace and to protect confidential business and client information, and the equally compelling need of employees to be properly safeguarded against retaliatory actions." Id. at 722.

In reaching this conclusion, we do not ignore

> "the concerns of employers that only a bright line rule
> that prohibits any employee from ever disclosing a document
> in pursuit of a discrimination claim and that equally
> prohibits any attorney from reviewing or considering such

---

[35] Such a determination is a question of law. See Leary v. Daeschner, 228 F.3d 729, 737 (6th Cir. 2000) (discussing retaliation for constitutionally protected conduct); Carter-Obayuwana v. Howard Univ., 764 A.2d 779, 790 (D.D.C. 2001) (same under antidiscrimination law). Summary judgment on this issue is appropriate where the moving party establishes the absence of genuine issues of material fact pertinent to this legal determination. See Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 643-644 (2002). At trial, "disputes as to . . . subsidiary facts are within the province of the jury; however, responsibility for the ultimate determination" regarding what constitutes protected activity "lies with the trial judge." See Roberts v. Sears, Roebuck & Co., 723 F.2d 1324, 1335 (7th Cir. 1983) (discussing similar issue in context of patent law). Cf. Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 250-251 (2010) (judge determined as matter of law that self-help discovery of document unreasonable, but lawyer's use of document on plaintiff's behalf reasonable; question of fact submitted to jury whether termination motivated by plaintiff's taking document or lawyer's using it).

documents provided by employees will fairly protect their
interests."

Quinlan, supra at 271-272.  But, while the employers' "right
to . . . expect that they will have the loyalty of their
employees" must be part of the calculus, so, too, must the
"right [of employees] to be free of discrimination in their
employment and . . . to speak out when they are subjected to
treatment that they reasonably believe violates that right."
Id. at 271.  "Balancing all of those considerations is a
difficult and important task."[36]  Id.

We emphasize two points in this regard.  First, the
protections discussed here are limited, applying as they do only

---

[36] To the extent that employers are concerned about
disclosure of privileged or highly sensitive information, not to
the plaintiff's attorney, but to the general public in the
course of litigation, "the trial courts can and should apply an
array of ad hoc measures from their equitable arsenal designed
to permit the . . . plaintiff to attempt to make the necessary
proof while protecting from disclosure" information that is
sensitive or subject to legal privilege.  See General Dynamics
Corp. v. Superior Court, 7 Cal. 4th 1164, 1191 (1994).  Such
measures may include, without limitation, the "use of sealing
and protective orders, limited admissibility of evidence, orders
restricting the use of testimony in successive proceedings, and,
where appropriate, in camera proceedings."  Id.  Other measures
may be appropriate where the plaintiff discloses the documents
to the general public before the start of litigation or in
violation of a judge's orders.  See generally Sommer v. Maharaj,
451 Mass. 615, 620-621 (2008), cert. denied, 556 U.S. 1235
(2009).  Because of the availability of such procedures, "[w]e
are confident that by taking an aggressive managerial role,
judges can minimize the dangers to the legitimate privilege
interests the trial of such cases may present."  See General
Dynamics Corp. v. Superior Court, supra.

to employees pursuing claims under G. L. c. 151B.  Second, even as to plaintiffs pursuing such claims, protection is afforded only to those acts determined to be reasonable under the circumstances.  This being so, employees pursuing discrimination claims who access, copy, or disseminate confidential material "even under the best of circumstances . . . run the significant risk that the conduct in which they engage will not be found . . . [ultimately] to fall within the protection[s]" of the statute.  See Quinlan, supra at 272.

We are not persuaded that where, as here, the plaintiff is an attorney, such that some of the documents at issue may be subject to the rules of attorney-client confidentiality and privilege, the plaintiff's actions should thereby be stripped of the protections afforded other employees by G. L. c. 151B. While the status of a document under the confidentiality and privilege rules is, to be sure, an important factor to be considered in the over-all reasonableness analysis, it is not, by itself, dispositive.  Were this not so, an "attorney-litigant who is contemplating a wrongful termination action against her former employer [would not] be able to consult meaningfully with counsel" about the merits of her discrimination case without risking "dismissal" of the suit or "disciplinary action for improper disclosure of confidences."  See Chubb & Son v. Superior Court, 228 Cal. App. 4th 1094, 1109 (2014) (attorney

may disclose client documents to her lawyer for purposes of wrongful termination suit). "[T]he shield of confidentiality" should not be turned "into a sword" to defeat discrimination claims by employee-attorneys whose proof of discrimination may be found in such privileged and confidential sources. See Fox Searchlight Pictures, Inc. v. Paladino, 89 Cal. App. 4th 294, 314 (2001).

The totality of the circumstances analysis to be applied in determining whether self-help discovery measures were reasonable should begin with the question whether the materials obtained would have been discoverable under the process set forth in Mass. R. Civ. P. 26, as amended, 423 Mass. 1401 (1996). It stands to reason that self-help discovery ordinarily should not be expected to yield more than what a litigant would otherwise be entitled to receive through formal discovery mechanisms.[37] Even as to discoverable material, the reasonableness of the self-help measures must then be evaluated in the totality of the circumstances. Without limiting the considerations that

---

[37] In instances where the employee's work involves privileged or otherwise highly sensitive information that is relevant to the employee's claims under G. L. c. 151B, the employer's assertion of privilege as to such information does not by itself render that information exempt from discovery. See, e.g., Chubb & Son v. Superior Court, 228 Cal. App. 4th 1094, 1108 (2014) (in discrimination suit by attorney-employee, court may order discovery of documents prepared by firm on behalf of clients even if documents subject to attorney-client and work-product privileges). See note 36, supra.

additionally may be relevant in individual cases, the seven nuanced factors in Quinlan should be taken into account in any such analysis.

The first factor asks "how the employee came to have possession of, or access to, the document." Quinlan, supra at 269. This factor favors "the employee who [does not] find[] a document by rummaging through files or by snooping around in offices of supervisors or other employees." Id.

A second factor seeks to "balance [the] relevance" of the seized documents to the employee's legal action against the disruption caused by the seizure "to the employer's ordinary business." Id. at 270. In so doing, "the focus must be on whether the use or disclosure of the document unduly disrupted the employer's business, rather than on any effect it had on individual company representatives." Id.

A third factor looks to "the strength of the employee's expressed reason for copying the document rather than, for example, simply describing it or identifying its existence to counsel so that it might be requested in discovery." Id.

A fourth factor asks

> "what the employee did with the document. If the employee looked at it, copied it and shared it with an attorney for the purpose of evaluating whether the employee had a viable cause of action or of assisting in the prosecution of a claim, the factor will favor the employee. On the other hand, if the employee copied the document and disseminated it to other employees not privileged to see it in the

ordinary course of their duties or to others outside of the company, this factor will balance in the employer's favor."

Id. at 269.

A fifth factor takes into consideration "the nature and content of the particular document in order to weigh the strength of the employer's interest in keeping the document confidential," id., while the sixth looks to "whether there is a clearly identified company policy on privacy or confidentiality that the employee's disclosure has violated." Id. at 270. As the New Jersey Supreme Court noted, the "evaluation of this [latter] factor should take into account considerations about whether the employer has routinely enforced that policy." Id.

A seventh and final factor takes into account "the broad remedial purposes the Legislature has advanced through our laws against discrimination, including [G. L. c. 151B]." Id. at 271. It also considers the decision's effect on "the balance of legitimate rights of both employers and employees." Id. This final factor is "a supplement" to the other factors, and plays a decisive role only in the "close case" in which it would be appropriate for these broader considerations to "tip the balance." Id. at 270.

The application of this test in particular cases may well result in determinations that certain acts of self-help discovery by the same employee are reasonable, while others are

not. Indeed, where the nature of documents discovered by this means may run the gamut from the plainly relevant and not privileged to the not relevant and plainly privileged, that result would not be unexpected.[38] Were this to be the case, the resolution of the claim of retaliation[39] likely would entail a determination whether the employee's unreasonable and unprotected acts, "standing alone, would have induced [the employer] to make the same [adverse employment] decision." See Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 113 (2009),

---

[38] By way of illustration, it is not inconceivable that arguments might be made in this case that such documents as the Eastern Point report and the attorney time records fall at one end of the spectrum, while the transcription of the Popeo voicemails, with the exception of the Kiser message, falls at the other.

[39] We leave for another day the question, not addressed by the parties, whether defendants may be held liable if they are found to have taken adverse action against an employee on the basis of her reasonable acts of self-help discovery, but are also found to have acted based on a good faith mistake of law that her actions were unreasonable and unprotected. See Equal Employment Opportunity Comm'n v. Board of Governors of State Colleges & Univs., 957 F.2d 424, 428 (7th Cir.), cert. denied, 506 U.S. 906 (1992); Bachelder v. American W. Airlines, Inc., 259 F.3d 1112, 1130 (9th Cir. 2001); Forman v. Small, 271 F.3d 285, 299 (D.D.C. Cir. 2001), cert. denied, 536 U.S. 958 (2002); Avila v. Continental Airlines, Inc., 165 Cal. App. 4th 1237, 1259-1260 (2008), as modified on denial of rehearing (Aug. 28, 2008). But see Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 728 (6th Cir. 2008) (regarding mistake of fact).

quoting Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 666 (2000).[40]

c. Tortious interference. The motion judge allowed Cohen's motion for summary judgment on the plaintiff's tortious interference claim because it was filed more than three years after the relevant acts took place and was, therefore, time barred. See G. L. c. 260, § 2A ("actions of tort . . . shall be commenced only within three years next after the cause of action accrues"). The plaintiff asserts that summary judgment should not have been granted because certain of Cohen's allegedly discriminatory acts fall within the three-year limitations period.

The plaintiff's contention is unavailing. The proper vehicle for her claims against Cohen would have been "the administrative procedure provided in" G. L. c. 151B. See G. L. c. 151B, § 9. The plaintiff failed to name Cohen in her MCAD complaints, and, according to her appellate brief, apparently did so for strategic reasons. "Insofar as the plaintiff's common law claim[] [is] merely [a] recast version[] of" a claim

---

[40] In Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 113 (2009), we applied the rule, originally established in Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655 (2000), that the employer "must show that its legitimate reason, standing alone, would have induced it to make the same decision." But see University of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013); Haddad v. Wal-Mart Stores, Inc., supra at 113 n.27.

that could have been made "under [G. L.] c. 151B, [it is] barred by that statute's exclusivity provision." Green v. Wyman-Gordon Co., 422 Mass. 551, 558 (1996). See Charland v. Muzi Motors, Inc., 417 Mass. 580, 583 (1994) ("An antidiscrimination statute such as Chapter 151B reflects the legislature's balancing of competing interests. Employees are protected against certain types of discharge. Employers are protected from unnecessary litigation by a relatively short statute of limitations . . . and a mandatory conciliation process" [citation omitted]).

3. Conclusion. The judgment on the claim for tortious interference is affirmed. The matter is remanded to the Superior Court for further proceedings consistent with this opinion with respect to the plaintiff's claims under G. L. c. 151B, § 4.

So ordered.