NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13825

KEVIN C. ROBINSON  vs.  TOWN OF MARSHFIELD.

Plymouth.      January 7, 2026. – May 15, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Dewar, & Wolohojian, JJ.

Fire Fighter.  Municipal Corporations, Fire department. Employment, Retaliation.  Anti-Discrimination Law, Employment, Burden of proof, Damages.  Evidence, Motive. Damages, Under anti-discrimination law, Remittitur, Punitive.  Practice, Civil, Instructions to jury, Special questions to jury, Damages, Judgment notwithstanding verdict, New trial.  Jury and Jurors.

Civil action commenced in the Superior Court Department on March 13, 2020.

The case was tried before Gregg J. Pasquale, J., and a motion for posttrial relief was heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

Jason W. Crotty (John J. Davis also present) for the defendant.
Anne Glennon (Marisa A. Campagna also present) for the plaintiff.
The following submitted briefs for amici curiae:
J. Lynn Milinazzo-Gaudet & Deirdre A. Hosler for Massachusetts Commission Against Discrimination.

Aaron A. Spacone & Catherine M. Scott for Massachusetts Defense Lawyers Association, Inc.

Emma Quinn-Judge & Noah Gillen for Massachusetts Employment Lawyers Association.

KAFKER, J.  The plaintiff, Kevin C. Robinson, sued his employer, the town of Marshfield (town), alleging retaliation in violation of G. L. c. 151B, § 4 (4).  Robinson was chief of the town's fire department (department), and he alleged that the town retaliated against him for complaining that his niece, who was also a firefighter in the department, was being discriminated against because of her gender.  After trial, a jury found the town liable for retaliation and awarded Robinson compensatory and punitive damages.  The town moved for judgment notwithstanding the verdict (judgment n.o.v.) or, in the alternative, for a new trial or remittitur of the verdict.  The motion judge, who was also the trial judge, denied the motion. The town appealed, and we transferred the case sua sponte.

On appeal, the town claims that the judge erred in denying its motion for judgment n.o.v. because the evidence was insufficient to find that the town retaliated against Robinson. The town also asserts that a new trial is required because the judge improperly instructed the jury by blending pretext and mixed-motive instructions.[1]

---

[1] Robinson has cross-appealed, arguing that, with respect to his retaliation claim, summary judgment should not have been

We conclude that there was sufficient evidence for the jury to find that the town retaliated against Robinson because he complained of gender discrimination.  We also conclude that the judge's jury instructions, as he recognized in his judgment n.o.v. decision, included some blending of pretext and mixed-motive language, even though this case should have been governed by the pretext framework alone.  Nonetheless, like the judge, we ultimately conclude these errors were not prejudicial because the instructions as a whole were adequate and the jury's answers to the special verdict questions -- and particularly the jury's award of punitive damages, which required a finding that the town's conduct was extreme and outrageous -- leave no doubt about their ultimate findings.  We therefore affirm.[2]

1.  Background.  a.  Facts.  Because the town argues that the trial evidence was insufficient to support the jury's verdict, we summarize the facts in the light most favorable to

---

granted in favor of the town on the issue of constructive discharge.  However, deciding the case as we do, we do not reach this cross appeal, because Robinson has waived it in the event that this court affirms the jury's verdict and damages award in full.

[2] We acknowledge the amicus briefs submitted by the Massachusetts Commission Against Discrimination; Massachusetts Defense Lawyers Association, Inc.; and Massachusetts Employment Lawyers Association.

the plaintiff.  See Haddad v. Wal-Mart Stores, Inc. (No. 1), 455 Mass. 91, 94 (2009).

i.  Robinson's employment.  Robinson began working as a firefighter for the town in 1978.  In 2003, Robinson was appointed fire chief by the town's board of selectmen (board). The fire chief is the appointing authority for the fire department and responsible for overseeing discipline, promotions, and training.  Robinson's employment contract provided for, among other things, annual written performance appraisals, written notice of performance deficiencies and an opportunity to cure, annual salary increases, and certain pay-outs if separated from employment other than for cause. Robinson never faced disciplinary action prior to the events in this case and received a positive performance appraisal in 2012.

Both Robinson's brother, Shaun, and Robinson's son, Craig, were firefighters in the department and worked under Robinson's supervision for several years.[3]  General Laws c. 268A sets forth standards of conduct for municipal employees with respect to conflicts of interest.  Because Shaun and Craig are Robinson's immediate family members as defined in G. L. c. 268A, § 1 (e),

---

[3] Because Shaun and Craig share a last name with Robinson, and because Shauna shared a last name with Robinson at the time of the facts of this case, we refer to Shaun, Craig, and Shauna by their first names.

in connection with Robinson's appointment as chief, Robinson submitted forms disclosing his financial interest and the appearance of conflicts of interest as required by G. L. c. 268A, §§ 19 (b) and 23 (b) (3).

ii. <u>Shauna's employment and training</u>. In February 2013, the department had two vacancies. The top two candidates on the civil service examination, both women, were Jodi Corrigan and Robinson's niece, Shauna, who was a paramedic. Before Shauna was hired, Robinson met with the board to discuss potential conflicts of interest in connection with her employment. Although nieces are not immediate family members under G. L. c. 268A, Robinson nevertheless submitted the forms disclosing his financial interest and the appearance of a conflict of interest, under § 19 (b) and § 23 (b) (3), as he had done when Shaun and Craig were hired. Robinson also recused himself from the hiring process.

In October 2013, the board approved Shauna's selection and Robinson's disclosure forms but set several conditions with respect to Robinson's involvement in Shauna, Craig, or Shaun's work. Specifically, as to these family members, Robinson was required to recuse himself from decisions relating to appointments or promotions; prohibited from making any discretionary assignments resulting in additional wages or overtime; and required to refer any disciplinary matters to the

town administrator, Rocco Longo, who would be responsible for investigating the matter and making a recommendation to Robinson.

Each new firefighter was required to serve a one-year probationary period before becoming a permanent firefighter. During that time, the new firefighter was required to complete emergency medical service (EMS) and firefighter training, followed by a nine-week program at the Massachusetts Firefighting Academy (fire academy). Pursuant to the department's EMS training program, if an employee lacked sufficient experience or competency, the employee would continue the training process and complete any additional remedial training for up to one year. The fire chief was authorized to approve additional training and to send firefighters to certain hospitals for skills training as necessary.

Both Corrigan and Shauna began their probationary year in November 2013. Captain Louis Cipullo oversaw Shauna's firefighter training, and Eric Morgan oversaw her EMS training. Deputy Chief William Hocking was ultimately responsible for Shauna's training because Robinson had recused himself. Any issues with Shauna's training would be reported to Hocking, who would report those issues to Robinson. Corrigan successfully completed both her firefighter and EMS training without incident.

iii. <u>Robinson's involvement in Shauna's training</u>. By early January 2014, multiple supervisors had expressed concerns that Shauna was struggling with her training, and Hocking conveyed this to Robinson.[4] As a result, Robinson and Hocking met with Shauna on January 9, 2014, and sought to create a plan to address her deficiencies.

On January 10, 2014, Shaun met with Robinson and Hocking to discuss his belief that Shauna was being treated or evaluated unfairly.[5] Robinson, as fire chief, and therefore a supervisor and member of the town's management, was required to report all incidents of harassment to the town administrator, pursuant to the town's antiharassment policy, which contains a broad definition of harassment. After meeting with Shaun and Hocking,

---

[4] For example, Cipullo was concerned that Shauna was too short for the job and that she was not able to reach the trucks' side ladders, physically throw ground ladders, or raise a twenty-four foot ladder. Morgan expressed concerns about Shauna's decision-making during emergency calls and indicated on most of her evaluation forms that Shauna needed retraining and her performance fell below expectations. The firefighters union president, Matthew Cohen, observed that Shauna was unable to complete "the stair chair of a patient down a few steps" or interpret "a 12-lead [electrocardiogram]"; she failed to report a gastrointestinal bleed to hospital staff; and she did not know that all patients who accidentally received epinephrine injections had to be transported to the hospital. On January 1, 2014, two months into her one-year probationary period, Cipullo told Shauna that she was running out of time to improve her skills.

[5] Both Robinson and Hocking testified that gender discrimination did not specifically come up at this meeting.

Robinson contacted town administrator Longo and the town's labor counsel, John Clifford, to discuss Shauna's training issues and the proper steps to address the situation.  Longo then sent an e-mail message to Robinson indicating that an ethics complaint had been brought to his attention and that they needed to address it immediately.

On January 20, 2014, Longo and Clifford met with Robinson to discuss a possible conflict of interest in violation of G. L. c. 268A, based on Robinson's January 10, 2014, meeting with Hocking and Shaun regarding Shauna's training and evaluation issues.  Later that day, Clifford sent an e-mail message to Robinson and Longo memorializing the agreement reached at the meeting.  Clifford recommended that Longo file a complaint with the State Ethics Commission to determine whether an ethics violation occurred.  Further, Clifford recommended that Robinson recuse himself from any further involvement in decisions concerning Shauna's training and evaluation, and that Longo contact an outside fire chief to advise him on Shauna's progress, using Hocking's assistance as necessary to implement that advice.  Clifford explained that if Longo and the outside fire chief determined that Shauna still failed to meet performance standards during her probationary period, they should forward that determination to Robinson, who, as the appointing authority for the department, was "the only person

with the legal ability to terminate" an employee, pursuant to his contract and the town charter. Robinson replied on January 22 and agreed to follow Clifford's recommendations and to cooperate in any ethics investigation. Longo then filed a complaint with the State Ethics Commission about Robinson's involvement in Shauna's training.

On January 20, Cipullo, who was overseeing Shauna's firefighter training, had sent an e-mail message to Robinson asking whether Shauna was ready to be assigned to "shift strength."[6] Because Robinson had recused himself from further involvement in Shauna's training, Robinson responded that Cipullo should assign her to shift strength if he believed she was ready. Cipullo then assigned Shauna to shift strength that day, and no one complained about that assignment. Robinson did not have any further involvement in Shauna's training from January 2014 until March 2014.

To assess Shauna's training progress, the town brought in two outside fire chiefs and Glenn Coffin, the president of Emergency Medical Teaching Services, Inc., an independent paramedic and EMS training organization. Coffin conducted written and practical examinations with Shauna and noted gaps in her protocol and knowledge. The two outside fire chiefs never

---

[6] The record indicates that a firefighter assigned to "shift strength" was ready to assume full duties.

met with Shauna or observed her performance but determined, based on her evaluation forms and Coffin's assessment, that Shauna was not qualified to be a firefighter or paramedic. Both fire chiefs recommended that Shauna receive additional training and be transferred to a different training group; neither fire chief recommended firing her. However, because Longo was concerned about moving Shauna to a training group with her father or cousin, Shauna was never transferred to a different training group. Shauna also never received any additional training to address her performance deficiencies.

In March 2014, Robinson reviewed Shauna's evaluation forms and Coffin's report. Most of Shauna's evaluations indicated that she needed retraining or improvement in various EMS skills. On March 31, 2014, Robinson met with Longo and Clifford to discuss the status of Shauna's training. Robinson planned to follow the recommendations of the outside fire chiefs and Coffin's report to provide Shauna with remedial training and to transfer her to a different training group. However, Longo wrote a memorandum to Robinson and copied the board, concluding that Shauna lacked the requisite paramedic skills to continue her probationary period. Longo stated that he recommended to Robinson that Shauna withdraw as a probationary candidate or that Robinson terminate her, and that Robinson refused to follow that recommendation. Longo concluded the memorandum by stating,

"As my recommendations will not be followed, I will have no further involvement in training, assessment or disciplining Firefighter Shauna Robinson.  Please advise Deputy Chief Hocking to discontinue providing me with any information regarding her training or performance, as you [Robinson] will be overseeing that process moving forward."

On April 2, 2014, Robinson made a plan for Shauna's training.  Among other assignments, Robinson determined that Shauna would work shift strength that day, particularly because she had worked shift strength without incident in January 2014.  Robinson also reached out to Captain Anthony Boccuzzo, the only captain who was a paramedic, to ask to transfer Shauna to a different training group.[7]  Shauna ultimately suffered a shoulder injury that prevented her from reporting to the fire academy, and she resigned on April 13, 2014.  Shauna testified that she felt the department was not evaluating her fairly; she had already worked as a paramedic for several years, but Morgan, her EMS training supervisor, nevertheless insisted she was doing everything wrong; and working at the department was a "miserable" and "stressful" experience.  Corrigan likewise resigned before the end of her first year and accepted

---

[7] Boccuzzo testified that Robinson asked him not to tell anyone about that conversation.

employment with a different fire department because morale at the department was low and there was conflict among the union, Robinson, and other employees.

iv. <u>The board's actions toward Robinson</u>. On April 7, 2014, Robinson had written a letter to Longo and copied the board responding to Longo's March 31, 2014 memorandum. Robinson complained that other firefighters with performance deficiencies had received additional training or counselling in the past and that Shauna's performance was fundamentally a training, and not a disciplinary, issue.[8,9] Moreover, Clifford's recommendation

---

[8] Specifically, Robinson wrote:

"Multiple firefighters in the past who were not [per]forming to the established standard during their probationary period have not been treated as a discipline issue but as a training issue and have been given additional training and/or coaching and counseling to resolve the issue. . . . We have many examples of firefighters who cannot perform all of the duties assigned and being paid while the department works to bring this firefighter in to compliance with our standard. . . An extended training period is not unprecedented when a new member is having difficulty with skills required to meet our standard in the last two years. Additionally, other members have been required to attend additional training or receive additional experience when their job performance is below our standard."

[9] Robinson testified about the specific instances of differential treatment he referenced in his letter. For example, one male firefighter failed a physical ability test and was permitted to retake it the following year, he was hired despite his continued struggles with medical skills, and he was afforded an extra month of training; another male firefighter struggled with emergency medical training and received assistance from different training groups until he was able to

following the January 20, 2014 meeting was assessment and training, but there had been no documentation of Shauna's training after January 21, and no assessment performed until March 25. Robinson tried to provide Shauna with the remedial training recommended by the outside fire chiefs and Coffin's report by placing her on shift strength.

On April 7, 2014, the firefighters union, through its president, Cohen, filed a grievance with the board complaining that Shauna's placement on shift strength posed a safety risk. One week later, the board held the union grievance hearing, in which Robinson, Clifford, Longo, and Cohen participated. Robinson submitted a letter to the board setting out twenty-five questions for the union, which included questions about extra training afforded to some firefighters within the last two years. Although the board did not allow Robinson to question Cohen, Robinson nevertheless defended his actions and told the board of other examples of firefighters who required additional training. At the conclusion of the hearing, Robinson presented

perform without issue; a third male firefighter received numerous demerits at the fire academy, but was eventually able to pass the fire academy with Robinson's counselling; a fourth male firefighter was unable to complete pull-ups or climb a ladder to a second-floor window, but Robinson counselled him to get a personal trainer; and a fifth male firefighter was provided remedial training to improve his medical skills.

Shauna's resignation letter, and the board voted to deny the union's grievance.

On April 24, 2014, the board received an anonymous letter complaining that Robinson created an environment of harassment, mistreatment, retaliation, and favoritism for his family.  Then, on May 26, 2014, the board received another letter from an anonymous "[s]enior" firefighter identifying Cohen as the author of the previous letter and asserting that most union members were embarrassed by that letter.

On May 21, 2014, Robinson had asked to meet with the board to discuss how Clifford and Longo had treated him, but the board declined to meet with him and told Robinson to reach out to Clifford and Longo directly.  Thus, on June 17, 2014, Robinson, accompanied by counsel, attended a meeting with Clifford and Longo.  Clifford began the meeting by commenting that Robinson was nearing retirement age and asking when he intended to retire.  Robinson replied that he had no plans to retire at that time and was still seeking to renew his contract for the next three years.  Clifford suggested that Robinson should think about retiring before his reputation was damaged.  Prior to complaining about Shauna's unfair treatment, Robinson testified that he had an excellent working relationship with Clifford and Longo and that they had worked as a team to address labor issues in the department.  But by the time of this meeting, Robinson

felt Clifford and Longo were making his job more difficult, and no agreement or resolution was reached.

In June 2014, pursuant to his employment contract, Robinson sought a two percent annual salary increase and to renegotiate his employment contract with the town. In an executive session on June 30, 2014, the board voted not to enter into contract negotiations with Robinson and not to approve the requested salary increase.

v. Robinson's involvement in Shaun's discipline. Pursuant to their contracts, members of the bargaining unit were entitled to rotation on the overtime shift list. However, on August 22, 2014, Shaun skipped Hocking on the overtime shift list and took the shift for himself. Longo consequently recommended that Shaun be disciplined by suspension without pay for three twenty-four hour shifts. Robinson ultimately suspended Shaun for one twenty-four hour shift.

On August 28, 2014, Clifford and Longo met with Robinson to discuss a potential violation of the conflict of interest law based on Robinson's involvement in reducing Shaun's suspension. Clifford expressed concern about Robinson's health and again suggested that Robinson should retire in September before his reputation was damaged, but Robinson refused.

vi. The Smith investigation. On November 24, 2014, the board hired attorney Mark Smith of Laredo & Smith, LLP, assisted

by investigator Edward Johnson, to "perform a comprehensive investigation into allegations of unlawful conduct and recent events" in the department, including any potential violations of the State ethics laws.

On January 2, 2015, Robinson wrote a detailed letter to the board stating that Clifford and Longo were harassing him and attempting to intimidate him to retire.

On January 15, 2015, Longo received a letter from the Massachusetts Commission Against Discrimination (MCAD) stating that Shauna had filed a complaint of discrimination against the department, along with a copy of her complaint. One week later, town counsel Robert Galvin forwarded the MCAD complaint to Smith and noted that, based on the statements contained therein, it appeared Robinson had assisted Shauna with her complaint.

On January 21, 2015, Smith scheduled an interview with Robinson. Because Robinson's attorney could not attend, Robinson tried to record the interview, but Smith would not allow it. Robinson refused to be interviewed without recording, so he left and was never interviewed. Smith never interviewed Shauna because she was no longer employed by the town. Smith also testified that he never inquired about how other firefighters with training deficiencies were treated in the department in the past.

On February 13, 2015, Longo sent Smith an e-mail message including Robinson's employment contract and the charter provisions that outline the process to terminate him.

On February 23, 2015, Smith sent Galvin a draft of his report, concluding that Robinson "may have" violated G. L. c. 268A. The next day, Galvin replied that Clifford believed Smith's conclusions "should be framed if they can be as [Smith's] opinions" to the extent possible.

One day later, on February 25, 2015, Smith issued his final report, concluding definitively that Robinson violated G. L. c. 268A and recommending that the town refer the matter to the State Ethics Commission. Among other things, Smith concluded that Robinson impermissibly interfered with Shauna's training and evaluation, rejected Longo's recommendations, and reduced Shaun's suspension.

On February 27, 2015, the board published a notice of a meeting to "investigate charges of criminal misconduct or to consider the filing of criminal complaints."

On March 2, 2015, the town referred the matter to the State Ethics Commission. The same day, Longo called Robinson to the station. When Robinson arrived to the station, Hocking and Johnson were inside, and the police captain was sitting in his cruiser in the parking lot. Robinson was handed a letter notifying him that he had been placed on administrative leave

for sixty days pending an investigation into his alleged State ethics law violations. The letter further stated that Robinson was prohibited from entering any town fire station without Galvin's permission, he had to turn over his keys to the building and equipment, he was prohibited from engaging in any official activities unless so directed by Galvin, and he was required to fully cooperate with the investigation. Robinson was then given a few minutes to collect his personal belongings and was escorted from the premises by Hocking and Johnson. Administrative leave was unusual in the department; only two employees had been placed on leave in recent years, for harassment and for driving while under the influence, respectively.

The following day, a constable served Robinson at his house with a notice to show cause why he should not be terminated based on Smith's report. The notice also informed Robinson of his right to a public hearing. There was subsequently a plethora of negative publicity in local papers speculating why Robinson had been placed on administrative leave and suggesting that he was being investigated for criminal conduct.

On March 12, 2015, in response to the notice to show cause, Robinson resigned. He testified that although he did not want to retire and was only five years from the mandatory retirement age, he risked losing his pension and separation benefits if he

was terminated.  He also wanted to leave the department's hostile environment because it was causing him extreme emotional distress, and he felt the department was trying to force him out.  Further, he did not believe he would receive a fair hearing because he did not believe the process would be independent.

On April 17, 2015, the State Ethics Commission notified Robinson by letter that it did not intend to further investigate his actions because he had retired.

On April 23, 2015, the State Ethics Commission sent a letter to Longo concluding that the matter did not warrant a public resolution or formal sanctions.  Longo forwarded the letter to Smith and stated that he was disappointed in the outcome and felt "let down by the State."

b.  Procedural history.  In December 2016, Robinson filed suit in Federal court against the town, Longo, and John E. Hall, the board's former chair, alleging age discrimination in violation of G. L. c. 151B, § 4 (1C), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a) (count one); retaliation under G. L. c. 151B, § 4 (4), and the ADEA, 29 U.S.C. § 623(d) (count two); failure to investigate and remedy under G. L. c. 151B and the ADEA (count three); breach of contract (count four); defamation (count five); and intentional interference with contractual relations (count six).  A judge of

the United States District Court for the District of Massachusetts allowed summary judgment for the town on all claims.  Robinson vs. Marshfield, U.S. Dist. Ct., No. 16-12560-NMG (D. Mass. Jan. 11, 2019), aff'd in part and vacated in part, 950 F.3d 21 (1st Cir. 2020).  The United States Court of Appeals for the First Circuit affirmed the District Court's rulings on count one in its entirety and counts two and three to the extent they raised claims under Federal law.  Robinson, 950 F.3d at 23.  However, the First Circuit held that the District Court should not have exercised supplemental jurisdiction over the State law claims.  Id.  Accordingly, the First Circuit dismissed the remaining claims without prejudice to be refiled in State court. Id.

On March 13, 2020, Robinson filed his remaining claims in the Superior Court in Plymouth County, which included claims of retaliation against the town, the then town administrator, and Hall; breach of contract against the town; tortious interference with contractual relations against Hall; and defamation against Hall.  The town moved for summary judgment.  The summary judgment judge granted the motion with respect to the defamation claim, denied it with respect to the retaliation and tortious interference claims, and denied it in part with respect to the

breach of contract claim.[10]  Robinson subsequently voluntarily dismissed with prejudice all the remaining claims except the retaliation claim against the town.

On November 13, 2023, after a two-week trial, a jury returned a verdict in favor of Robinson.  The jury awarded $300,000 in compensatory damages for emotional distress and $1,100,000 in punitive damages.  The town filed a motion for judgment n.o.v., or, in the alternative, for a new trial or remittitur; it argued, among other things, that the verdict was against the weight of the evidence, erroneous jury instructions required a new trial, and there was insufficient evidence to support a punitive damages award.  The judge concluded that "[a]lthough the jury instructions erroneously contained elements of both [pretext and mixed-motive] frameworks, [the] instructions as a whole adequately conveyed the applicable law." The judge also concluded that the verdict was not against the weight of the evidence and the evidence supported a punitive damages award.

The town appealed regarding these issues.  We transferred the case to this court on our own motion.

_____

[10] As explained supra, summary judgment was granted in favor of the town on the issue of constructive discharge.

2. Discussion. a. Statutory background. "General Laws c. 151B, § 4 (4), prohibits retaliation by making it unlawful for 'any person . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices' forbidden under G. L. c. 151B." Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 121 (2000). To prevail on a retaliation claim under G. L. c. 151B, an employee-plaintiff must prove that (1) "the employee reasonably and in good faith believed that the employer was engaged in wrongful discrimination," (2) "the employee acted reasonably in response to that belief through reasonable acts meant to . . . oppose . . . discrimination (protected activity)," (3) "the employer took adverse action against the employee," and (4) "the adverse action was a response to the employee's protected activity" (quotations and citations omitted). Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 405-406 (2016).

"A claim of retaliation is separate and distinct from a claim of discrimination." Verdrager, 474 Mass. at 405. "An employee bringing a retaliation claim is not complaining of discriminatory treatment as such, but rather of treatment that punish[es] [the employee] for complaining of or otherwise opposing such discriminatory treatment" (quotation and citation omitted). Id. "For this reason, a 'claim of retaliation may

succeed even if the underlying claim of discrimination fails,'" provided that the employee "reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination." Id., quoting Psy-Ed Corp. v. Klein, 459 Mass. 697, 706-707 (2011).[11]

b. Sufficiency of the evidence on liability. The town argues that the judge erred in denying its motion for judgment n.o.v., under Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), because the evidence was insufficient to show that (1) Robinson reasonably believed that Shauna was discriminated against because of her gender; (2) Robinson engaged in protected activity; and (3) a causal connection existed between Robinson's protected activity and the town's adverse actions. We conclude the evidence was sufficient.

"When considering a motion for judgment n.o.v., the judge's task, taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff." Luppold v. Hanlon, 495 Mass. 148, 163 (2025), quoting Phelan v. May Dep't Stores Co., 443 Mass. 52, 55 (2004). "The verdict will be upheld if it

---

[11] We note that the MCAD found no probable cause to support Shauna's claim of discrimination.

may be determined that 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff'" (citation omitted). Sullivan v. Five Acres Realty Trust, 487 Mass. 64, 68 (2021).

Viewing the evidence in the light most favorable to Robinson, the evidence was sufficient to support the jury's determination that the town retaliated against him. There was evidence supporting differential treatment, Robinson's complaints regarding such treatment, the town's knowledge of such complaints, and a causal connection between the complaints and the town's adverse actions against Robinson.

In Robinson's detailed statement to the board, he explained how, unlike Shauna, other firefighters with performance deficiencies were given additional training or counselling in the prior two years. See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 685 (2016) (similarly situated employees who were not Black "were given opportunities to remediate or repeat rotations," unlike plaintiff); Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 48 (2005) ("That [the defendant] retained lower-rated, similarly situated male employees eliminates one of the most obvious explanations for the [plaintiff's] discharge -- her lower proficiency" [quotations and citation omitted]); Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 130

(1997) (relevant comparators are similarly situated "in terms of performance, qualifications and conduct" [citation omitted]). Because the department was overwhelmingly male, the jury could have reasonably found that Robinson was engaging in protected activity by complaining that male firefighters performing unsatisfactorily were afforded training opportunities but Shauna was not. Moreover, the MCAD notified the town that Shauna had filed a gender discrimination complaint, and Galvin believed Robinson was assisting Shauna with her claim. As explained supra, a claim for retaliation may succeed even if the underlying claim for discrimination does not. Furthermore, G. L. c. 151B, § 4, does not require certainty that wrongful discrimination has occurred; all that is required is a reasonable, good faith belief that the employer engaged in wrongful discrimination. See Verdrager, 474 Mass. at 405; Psy-Ed Corp., 459 Mass. at 706-707; Abramian, 432 Mass. at 121-122.[12]

Finally, the evidence was also sufficient for the jury to infer causation, that is, that the town retaliated against Robinson because he complained of gender discrimination. Temporal proximity between the employee's protected activity and the ensuing adverse action "is one form of circumstantial

---

[12] The town raises no meaningful argument regarding good faith.

evidence that . . . can demonstrate the required causal connection" (quotation and citation omitted).  Verdrager, 474 Mass. at 409.  When Robinson began to complain about the unfair treatment of Shauna, he had been successfully employed in the department for more than three decades and had been the chief for over one decade.  After his complaint, a series of interrelated actions occurred in relatively short order in a way that could be reasonably interpreted as retaliatory.  See Mole v. University of Mass., 442 Mass. 582, 596 (2004); Salvi v. Suffolk County Sheriff's Dep't, 67 Mass. App. Ct. 596, 605-606 (2006).  Within ten days of Robinson's reporting of Shaun's complaint that she had not been treated the same as similarly situated male employees, Longo and Clifford met with Robinson to discuss a possible conflict of interest in violation of G. L. c. 268A.  Approximately three months after Robinson complained to the board that Shauna was being treated unfairly, the board voted not to renew his employment contract and not to increase his salary.  Then, almost two months after he refused to retire, the Smith investigation began.  Finally, about one month after Galvin notified Smith about Robinson's apparent assistance in Shauna's MCAD complaint, Robinson was escorted from the workplace, ordered not to return, and placed on administrative leave, an action highly unusual for the town, and previously used only in cases of harassment and operating while under the

influence offenses.  The timing of these events, demonstrating temporal connections between complaints of discrimination and the town's reaction, is sufficient evidence to support the jury's determination that the town retaliated against Robinson because of his protected activity.

c.  Whether the jury instructions on mixed motives and pretext were erroneous.  We next consider the town's argument that the jury instructions were erroneous and require a new trial, as they improperly blended pretext and mixed-motive instructions.  "We review objections to jury instructions to determine if there was any error and, if so, whether the error affected the substantial rights of the objecting party." Luppold, 495 Mass. at 158, quoting Dos Santos v. Coleta, 465 Mass. 148, 153-154 (2013).  "'A trial judge has wide latitude in framing the language to be used in jury instructions' as long as the instructions adequately explain the applicable law." Luppold, supra, quoting Kelly v. Foxboro Realty Assocs., LLC, 454 Mass. 306, 316 (2009).

Before we turn to the instructions given in the instant case, we explain the two frameworks for allocating evidentiary burdens in a discrimination or retaliation case under G. L. c. 151B, § 4, and the statute's causation requirement.

i.  The pretext and mixed-motive frameworks.  An employer rarely announces that it has taken an adverse action against an

employee because of a discriminatory or retaliatory motive. See Verdrager, 474 Mass. at 406. Consequently, plaintiffs often must rely on circumstantial evidence to prove these elements of a discrimination or retaliation claim. See id. Courts evaluate such cases "using a three-stage burden-shifting paradigm" as first set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973), and adopted for State discrimination claims in Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 138-139 (1976). Verdrager, supra. See Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 440-441 (1995). In the first stage, the "plaintiff has the initial burden to establish a prima facie case. Once [the plaintiff] succeeds in doing so, [in the second stage,] the burden of production shifts to the employer to articulat[e] a legitimate, nondiscriminatory reason for the adverse employment action. Once the employer meets its burden, it falls to the plaintiff in the [third and] final stage to prove that the employer's reason proffered in stage two is just a pretext" (quotations and citations omitted). Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 665-666 (2000). See Wheelock College, supra at 138. In this final stage, the plaintiff can meet his burden by either persuading the fact finder that the alleged illegitimate motive more likely caused the employer's adverse action or "by showing

that the employer's proffered explanation is unworthy of credence." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 255-256 (1981). See Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001). Although the burden of production under the pretext framework shifts between the parties as described, the "plaintiff retains the burden of persuasion" at all times. Burdine, supra at 256. See Johansen v. NCR Comten, Inc., 30 Mass. App. Ct. 294, 299 (1991).

"There exists, however, a rare class of cases, referred to as 'mixed-motive' cases," where the plaintiff does have some "strong (direct)" evidence that an "illegitimate" motive factored into the adverse employment decision. Wynn & Wynn, P.C., 431 Mass. at 666. A different burden-shifting framework applies where there is such strong evidence of illegitimate motive that it makes little sense to frame the issue as whether the employer's apparent motive was a pretext. "Once the plaintiff carries [his] initial burden [with such strong evidence], the burden of persuasion shifts to the [employer]." Id. at 670. See Johansen, 30 Mass. App. Ct. at 299. Thus, unlike under the pretext framework, an employer cannot avoid liability by producing evidence of "a legitimate reason for its decision." Id. at 301. Instead, the employer "must show that its legitimate reason, standing alone, would have induced it" to take the same action. Id., quoting Price Waterhouse v. Hopkins,

490 U.S. 228, 252 (1989) (plurality opinion). Accordingly, "[t]he inquiry in [mixed-motive] cases is not whether a legitimate reason for the [adverse employment action] is a 'pretext.' Rather, the appropriate question is whether the employer's proffered legitimate reason <u>also</u> motivated the employment decision and, if so, to what extent . . . ." <u>Wynn & Wynn, P.C.</u>, <u>supra</u>.

Whether the pretext or mixed-motive framework governs a given case, therefore, depends on the nature of the plaintiff's evidence that an illegitimate motive caused the adverse employment action. Although this inquiry is sometimes phrased as whether such evidence is "indirect" or "direct," this terminology is perhaps "too elusive a guide." <u>Johansen</u>, 30 Mass. App. Ct. at 299. It is more helpful to ask whether the evidence, "if believed, results in an inescapable, or at least highly probable, inference that [an illegitimate motive] was present in the workplace." <u>Id</u>. at 300. If so, the mixed-motive framework applies. If not, as is usually the case, the pretext framework applies.

Because the strength of illegitimate-motive evidence can be difficult to characterize and may evolve as evidentiary rulings are made throughout a trial, "[a] plaintiff is not required to choose between a mixed-motive approach and a pretext approach; [he] may proceed on either basis, or both." <u>Wynn & Wynn, P.C.</u>,

431 Mass. at 667 n.23. However, "[o]nce all the evidence is received, the judge should decide whether the mixed-motive or pretext framework properly applies to the evidence." Id. at 670 n.32. This is because the two frameworks are mutually exclusive. The three-stage process governing pretext cases is "premised on the idea 'that either a legitimate or an illegitimate set of considerations led to the challenged decision." Id. at 666, quoting Price Waterhouse, 490 U.S. at 247. Conversely, the mixed-motive framework assumes that both legitimate and illegitimate considerations were present. Therefore, a jury can only be instructed according to one framework, and it is for the judge to evaluate the strength of the evidence and ultimately decide which framework governs.

ii. The causation requirement. Proof of causation is required in both pretext and mixed-motive cases. See Lipchitz, 434 Mass. at 506 (holding that trial judge erred by failing to "alert the jury to the requirement that [the employee] prove a causal link" between employer's illegitimate motive and adverse employment action). In both types of cases, the illegitimate motive must be "a determinative factor" in the decision to take the adverse action. Psy-Ed Corp., 459 Mass. at 707. See Edwards v. Commonwealth, 488 Mass. 555, 571-572 (2021) (describing "determinative" or "but for" causation standard

under G. L. c. 151B, § 4).  However, "who bears the burden of proving [causation]" differs.  Lipchitz, supra at 505 n.17.

In a pretext case, although we permit the fact finder to infer either illegitimate motive or causation, or both, if the plaintiff proves that the employer offered a false reason for the employment decision, both illegitimate motive and causation remain required elements a plaintiff must prove in a retaliation claim.  Lipchitz, 434 Mass. at 502.  In a mixed-motive case, because of the strong evidence of discriminatory or retaliatory motive, proof of causation shifts to the defendant.  If the jury conclude that the employer has failed to prove that it would have taken the same actions absent the illegitimate motive, then necessarily the illegitimate motive was a "determinative" cause of the adverse actions and these two elements are satisfied.  Cf. Wynn & Wynn, P.C., 431 Mass. at 669-670 (after employee carries his or her initial burden, in mixed-motive case, employer "'may avoid a finding of liability only by proving that it would have made the same decision' even without the illegitimate motive" [emphasis added; citation omitted]).

iii.  The instructions in the instant case.  We return to the facts and instructions in this case.  As explained supra, Robinson's evidence of illegitimate motive was sufficient, but not the type of strong evidence required in the "rare" cases that call for mixed-motive analysis.  Wynn & Wynn, P.C., 431

Mass. at 666. Robinson complained of unfair treatment of his niece, but he did not expressly describe it as gender discrimination. That must be inferred. Although there was some temporal proximity between Robinson's opposition to Shauna's unfair treatment and the adverse employment actions -- approximately three months between the time of his letter to the board and the nonrenewal of his employment contract, and approximately one month between Galvin learning of Robinson's possible role in Shauna's MCAD complaint and Robinson's placement on administrative leave -- it is not immediate. See Mole, 442 Mass. at 592 ("if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity, an inference of causation is permissible"). Furthermore, Robinson's intervention on behalf of his niece was fraught with the possibility of nepotism and violation of G. L. c. 268A. Thus, the town's reaction to his intervention on behalf of his niece and its timing had a plausible, obvious, legitimate explanation as well. Although Robinson's evidence of retaliatory motive, if believed, permits the inference that the town retaliated against Robinson, such inference is neither "inescapable" nor "highly probable." Johansen, 30 Mass. App. Ct. at 300. Therefore, this is not one of the rare cases presenting strong evidence of an illegitimate motive. Rather,

it is a pretext case, and the jury should have been instructed according to that framework only.  See Wynn & Wynn, P.C., supra at 670 n.32.

Much of the judge's instructions were unobjectionable.  He instructed the jury:

> "In order to prevail on a claim of retaliation, the Plaintiff must prove three elements by a preponderance of the evidence.  1, the Plaintiff engaged in protected conduct; 2, the Defendant knew of the protected conduct and acted adversely against the Plaintiff; 3, a causal connection existed between the protected conduct and the adverse action."

Where the judge went astray was during his instructions to the jury for resolving the plaintiff's and the defendant's competing explanations for the adverse employment decision in a pretext case.  As explained supra, employers rarely state that they rely on discriminatory or retaliatory reasons for an adverse employment decision, so the jury are often required to make this determination by evaluating circumstantial evidence.  See Verdrager, 474 Mass. at 406.  In pretext cases, juries are commonly instructed:

> "Circumstantial evidence of discrimination [or retaliation] can include proof that the reason given by [the defendant] for [the adverse action] is not true or, if more than one reason was given for [the adverse action], that at least one of the reasons given was not true. . . .  [Such pretext evidence] standing alone may, but need not, support an inference of unlawful bias.  Therefore, if the plaintiff has persuaded you that at least one of [the employer's] reasons is false, you may, but are not required to, infer that [the employer] is covering up a discriminatory [or

retaliatory] intent, motive, or state of mind."  (Footnote omitted.)

Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.3 (Mass. Cont. Legal Educ. 3d ed., 2d Supp. 2018).  The judge's instructions did not, however, track this common instruction.  Instead, he blended pretext and mixed-motive instructions as follows, beginning unexceptionally but continuing more problematically:

> "So with regard to a nonretaliatory basis for employment decision, an employer may take adverse employment action against an employee for many nonretaliatory reasons.  It will be up to you to decide whether the Plaintiff has proved by a preponderance of the evidence that the Defendant committed an adverse employment action in retaliation for his report or opposition to gender discrimination against his niece, Shauna."

So far, so good.  Then, the judge, at the invitation of the parties, introduced mixed-motive concepts into what should have been a pretext instruction:

> "If you find that the Defendant had other alleged legitimate reasons for its actions with respect to the Plaintiff or that the other legitimate reason was the sole reason for its actions, then you must find that the Defendant -- for the Defendant unless the Plaintiff has adduced some significantly probative evidence that the Town's proffered reason or reasons was or is pretextual."[13]

---

[13] Both the town and Robinson requested portions of this instruction.  The town's proposed instruction said, in part, that a verdict for the town was required if "the Town had other legitimate reasons for its actions with respect to [the plaintiff]."  Robinson, however, asked that "or that the alleged other legitimate reasons were the sole reason[s]" be added to this sentence.  The town objected to this addition.

This instruction is confusing in a pretext case.  The discussion of "other" or "sole" reasons is more commonly associated with mixed-motive cases, where the plaintiff has already produced strong evidence that an illegitimate motive was present; the focus then turns to whether the employer also had legitimate motives for the employment decision and whether the employment decision would have been the same regardless of the protected conduct.  This is a different inquiry from the one required in a pretext case, as explained supra.  In other words, the discussion of "other" or "sole" reasons is misleading because it blends mixed-motive analysis into the pretext framework.  The instruction also leaves the term "pretext" undefined.  See Lipchitz, 434 Mass. at 508 (cautioning against "burden[ing] the jury with terms like . . . 'pretext'").

Further complicating matters, the judge then gave what the parties referred to as the "Mt. Healthy defense," see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), which the town requested and Robinson agreed to:  "If you find that the Defendant would have acted the same even if the Plaintiff did not complain about or oppose . . . gender discrimination, then you must find for the Defendant."  In this context, however, this defense is again more commonly associated with a mixed-motive case, where strong evidence of discriminatory or retaliatory animus has already been

established by the plaintiff and where the burden of persuasion

therefore shifts to the defendant to prove this defense.[14]  See

Johansen, 30 Mass. App. Ct. at 301, citing Price Waterhouse, 490

U.S. at 252.

Next, the judge returned to traditional pretext analysis:

"The Defendant has asserted that it had legitimate non
retaliatory reasons for its actions.  If the Plaintiff
convinces you that the alleged nonretaliatory reasons put
forth by the Defendant for the adverse actions are false,
that fact may be used by you to infer that the reason for
the adverse action was retaliation."

The sixth and seventh questions on the special verdict

form, again at the invitation of the parties, also blended

pretext and mixed-motive concepts in a confusing manner.  The

sixth question related to the "Mt. Healthy defense," asking:

"Has the Town of Marshfield proven by a preponderance of the

evidence that it would have treated Mr. Robinson the same

regardless of whether he engaged in protected activity?"  The

question asked the jury to answer "Yes" or "No," and it

instructed that "[i]f you answered 'Yes' . . . , go to Question

7."  The verdict form's instruction to proceed to the seventh

question if they answered "Yes" conflicted with the judge's

instructions, however, which told the jury that a verdict for

the defendant was required if the answer to this question were

---

[14] The judge's instructions to the jury did not instruct
that the town bore the burden of proof on this issue.

"Yes."  See supra.  But on the special verdict form, the jury answered "Yes" and, as directed by that form, continued to the seventh question.  Both parties ultimately agreed to the formulation of the sixth question, including the direction that the jury continue to the seventh question even if they answered "Yes."[15]

The seventh question asked:  "Has Mr. Robinson proven by a preponderance of the evidence that the Town's articulated, nonretaliatory reasons were not true or not the sole reason for the alleged adverse actions?"  The question again asked the jury to answer "Yes" or "No," and the jury also answered "Yes" to this question.[16]  This answer seems in tension with the jury's answer to sixth question; if the jury found that the town proved it would have treated Robinson the same absent his protected

---

[15] The special verdict form used at trial closely tracked the special verdict form proposed by the town.  The sixth question on the town's proposed form called for substantially the same inquiry as the sixth question on the final form, and it likewise directed the jury to move on to the seventh question if they answered "Yes" to the sixth question.  Although plaintiff's counsel raised a question about the sixth question as the form was finalized, she likewise concluded it was correct to have the jury move to the seventh question after answering "Yes."

[16] The seventh question on the town's proposed form asked: "Has Mr. Robinson proven by a preponderance of the evidence that the Town's articulated, nonretaliatory reasons were not true?" This resembles the seventh question on the form used at trial, except for the clause "or not the sole reason for the alleged adverse actions," which Robinson requested and the town objected to.

conduct, that finding suggests the town's actions were motivated by its articulated nonretaliatory reasons. However, the jury's answer to the seventh question leaves open the possibility that the jury found the town's articulated nonretaliatory reasons were not the sole reason for the alleged adverse actions, meaning that retaliatory or other unarticulated reasons also contributed. If those reasons were retaliatory, that finding supports a verdict for Robinson. If the unarticulated reasons were not retaliatory, it does not support a verdict for Robinson.

In sum, the introduction of mixed-motive analysis in the instructions and verdict slip, without strong evidence of illegitimate motives as required in a mixed-motive case, and the inconsistent treatment of the answer "Yes" in the instructions and the sixth question were error, albeit error invited in part by both parties. The question becomes whether these errors were prejudicial. We turn to that question next.

In evaluating whether these errors were prejudicial, we must review the jury instructions as a whole. See Draghetti v. Chmielewski, 416 Mass. 808, 818 (1994) ("We view the questions submitted to the jury in light of the instructions given by the judge"). See also Governo Law Firm LLC v. Bergeron, 487 Mass. 188, 194 (2021), quoting Blackstone v. Cashman, 448 Mass. 255, 270 (2007) ("An error in jury instructions is not grounds for

setting aside a verdict unless the error was prejudicial -- that is, unless the result might have differed absent the error"). As discussed supra, the instructions began properly and addressed the core issues. The jury were instructed that Robinson was required to prove by a preponderance of the evidence that he engaged in protected conduct, the town knew of the protected conduct and acted adversely against him, and a causal connection existed between the protected conduct and the adverse action.

The special verdict form, at least when reviewed in its entirety, also supported the verdict. Critically, the jury answered "Yes" to the fifth question on the form, concluding that Robinson proved by a preponderance of the evidence that a direct causal connection existed between his protected activity and the adverse action. This properly required the plaintiff to prove causation, without shifting the burden to the defendant as would occur in a mixed-motive case. The jury also answered "Yes" to the ninth question, concluding that Robinson proved by a preponderance of the evidence that the town intentionally discriminated against him and the town's actions were extreme and outrageous. The jury then awarded punitive damages in the amount of $1,100,000.

Based on a review of all the jury instructions and all the jury's responses to special questions, we conclude that the

errors in the instructions, unnecessarily introducing mixed-motive concepts into a pretext case, were not prejudicial to the town. The jury here made the findings, according to the instructions, necessary in a pretext case. To reiterate, they found that the town intentionally retaliated against Robinson. They also found that Robinson proved by a preponderance of evidence that there was a direct causal connection between the protected activity and the adverse employment decision, without shifting the burden to the defendant as occurs in a mixed-motive case. Finally, and perhaps most importantly, the jury found this intentional misconduct extreme and outrageous, eliminating any doubts raised by their confusing answers to the sixth and seventh questions, with respect to which any confusion was invited by both parties. See DaPrato v. Massachusetts Water Resources Auth., 482 Mass. 375, 389 (2019) (jury instruction not prejudicial "[g]iven the jury's unequivocal decision in favor of [the plaintiff]" where "[t]he jury awarded punitive damages because [they] found the [defendant's] conduct outrageous").

d. Punitive damages. We also affirm the award of punitive damages. Neither party challenges the instructions given by the judge at trial with respect to punitive damages, and upon review, those instructions appear to have been adequate. See Dartt v. Browning-Ferris Indus., Inc. (Mass.), 427 Mass. 1, 17 (1998). See also Haddad, 455 Mass. at 107. Although the

evidence was hotly contested, with the town contending that nepotism and bad management were the cause of the adverse employment actions and Robinson contending it was retaliation for his objection to gender discrimination, the jury chose to credit Robinson, not the town.  If the actions the town took against Robinson were retaliatory, as the jury found, we cannot say such actions were not extreme and outrageous considering Robinson's long tenure as a firefighter and fire chief of the town in good standing since 1978.[17,18]

3.  Conclusion.  For the foregoing reasons, the judgment, which includes the damages awarded to Robinson, and the order denying the town's motion for judgment notwithstanding the verdict or for a new trial or remittitur are affirmed.

So ordered.

---

[17] Because Robinson conditionally waived his cross appeal of the dismissal of his constructive discharge claim in the event that we affirm the jury's verdict and damages award, and we do so here, we need not decide this issue.  See note 1, supra.

[18] Robinson has requested an award of appellate attorney's fees and costs in his brief.  As the prevailing party on appeal in a G. L. c. 151B action, he is entitled to recover reasonable attorney's fees and costs.  See DeRoche v. Massachusetts Comm'n Against Discrimination, 447 Mass. 1, 17 (2006).  Robinson may file an appropriate application for appellate fees and costs in this court, pursuant to the procedure established by Fabre v. Walton, 441 Mass. 9, 10-11 (2004).